892 P.2d 947

**REX, INC., licensee, and Rex Wilson, qualifying party, Plaintiffs–Appellants,**

v.

**MANUFACTURED HOUSING COMMIT-TEE OF the STATE OF NEW MEXICO, MANUFACTURED HOUSING DIVI-SION, Defendant–Appellee.**

No. 21831.

Supreme Court of New Mexico.

March 14, 1995.

Paul R. Smith and Cynthia A. Fry, Albuquerque, for appellants.

Tom Udall, Atty. Gen. and Allen R. Ferguson, Jr., Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

FROST, Justice.

Petitioner–Appellant Rex, Inc., (Rex) appeals from an order by Respondent–Appellee Manufactured Housing Committee (MHC) requiring that it repay, in full, a down payment made by Dimples Atkins (Atkins) on a mobile home. Rex argues that the MHC was collaterally estopped from ordering repayment because Atkins and Rex had already settled their claims by arbitration. Rex also contends that the MHC improperly allowed Rex only one peremptory challenge at the disciplinary hearing. We reverse in part and remand.

### I. FACTS

On August 20, 1991, Atkins entered into a contract to purchase a customized mobile home from Rex, a dealer of manufactured homes who is licensed by the State Manufactured Housing Division (MHD).[1] The contract was expressly contingent upon the "acceptance by a finance agency" of a retail installment contract or security agreement. Atkins intended to purchase the mobile home

---

1. The Manufactured Housing Division (MHD) is an investigative and administrative body that regulates the manufactured-housing industry. The Manufactured Housing Committee (MHC) is a seven-member board that provides technical and policy advice for the MHD and adjudicates disputes involving violations of the Manufactured Housing Act and MHD regulations. *See* Manufactured Housing Act, NMSA 1978, §§ 60–14–4 to –5 (Repl.Pamp.1989).

for her disabled son, and she included payments she received for the care of her son as available income on the financing application.

Over the next three months, Atkins made down payments on the mobile home totalling $15,250. On September 20, 1991, Green Tree Acceptance, Inc., (Green Tree) a financing company, conditionally approved Atkins' financing of the mobile home. Green Tree conditioned final approval on, among other things, the actual delivery of the mobile home to Atkins and upon receipt of a check for titling fees. The next month, Rex ordered and received the custom mobile home from the factory and indicated to Atkins that it was prepared to deliver the home. However, due to inclement weather and muddy conditions at the intended site of the mobile home, Atkins requested that delivery be postponed.

On December 31, 1991, before the home had been delivered, Atkins' son died. As a result of the death, Atkins' income dropped significantly. Green Tree notified Atkins in January that she no longer qualified for financing, stating that her change in income "made the application a dead deal." Atkins, in turn, wrote to Rex on January 15, 1992, asking that it refund her $15,250 down payment in full. She also forwarded a copy of the demand letter to the MHD, which initiated an investigation into the matter. In March 1992 Rex notified the MHD that it would not return any of the deposit and intended to enforce the contract for the full purchase price of $54,735. Atkins then filed a civil lawsuit against Rex seeking a refund of her down payment.

On May 4, 1992, the MHC issued a notice of contemplated action (NCA) against Rex for failure to refund Atkins' full deposit in violation of MHD Regulations 207(B) and 207(C). These Regulations provide:

> B. In the event financing is denied or terms of approval are unacceptable to buyer and seller[,] deposits will be refunded in full. For other circumstances for which the buyer fails to complete his obligation for the purchase, deposits will be refunded as follows:
>
> 1. Deposits on units in stock will be refunded in full less a maximum of $150.00 to help defray dealer expenses in processing the sale.
>
> 2. Deposits on special ordered units will be refunded in full less a maximum of 10 percent of the selling price to help defray dealer expenses.
>
> C. The timetable for refund of deposit is:
>
> 1. Cash deposits should be refunded within one business day, but in no case, later than 5 business days after request for refund.
>
> 2. Check deposits should be refunded within one business day after clearing the maker's bank, but in no case, later than 5 business days.

Deposits, N.M. Manufactured Hous.Div.Reg. 207(B)–(C), 2 N.M. Reg. No. 7, 8 (Apr. 15 1991). The NCA advised Rex that the MHC had sufficient evidence, if not rebutted or explained, to suspend or revoke Rex's dealer's license and attach Rex's consumer protection bond. The NCA also provided for an administrative hearing upon timely request.

Four days after the MHC issued the NCA, Rex and Atkins settled their lawsuit. The settlement agreement provided that Rex refund all but 10% of the purchase price and pay Atkins' costs and attorney's fees. Both parties agreed to arbitrate the disposition of the remaining 10%. The MHC and MHD were not parties to the arbitration. The arbitrator concluded that Green Tree had not denied financing to Atkins and that, under MHD Regulation 207(B), Rex was permitted to retain a portion of Atkins' deposit up to 10% of the purchase price in order to defray its expenses in the aborted sale. The arbitrator determined that Rex's expenses totalled $3,724.24 and awarded the balance of the remaining deposit money to Atkins.

After reviewing the arbitrator's decision, the MHC decided to pursue its administrative action against Rex, and a hearing was set for November 19, 1992. At the hearing, Rex attempted to peremptorily disqualify two of the MHC members under the Uniform Licensing Act, NMSA 1978, § 61–1–7(C) (Repl.Pamp.1989). The MHC ruled that Rex was entitled to only one peremptory disqualification at the hearing. On November 30, 1992, the MHC issued its ruling that

Rex had violated both 207(B) and 207(C). It ordered Rex to return the remaining portion of the down payment, $3,724.24, to Atkins and attached Rex's consumer protection bond for that amount. It also suspended Rex's dealer's license for thirty days but provided that the suspension would be stayed if Rex returned the payment. Finally, the MHC placed Rex's license on probation for a period of six months. The district court upheld the order of the MHC on administrative appeal.

Rex now asks this Court to review the MHC's order on two grounds. First, it claims that the MHC was collaterally estopped by the arbitration decision between Rex and Atkins. Second, Rex argues that the MHC violated Section 61–1–7(C) by allowing Rex only one peremptory challenge of the committee members at the hearing.[2]

■ In examining any administrative order, this Court conducts the same review as the district court and, at the same time, determines whether the district court erred in the first appeal. *Padilla v. Real Estate Comm'n*, 106 N.M. 96, 97, 739 P.2d 965, 966 (1987); *see* NMSA 1978, § 61–1–23 (Repl. Pamp.1993) (Appeal to Supreme Court). Our examination is limited to assessing whether the agency acted arbitrarily or capriciously, whether the decision was supported by substantial evidence, and whether the agency acted within the scope of its authority. *Conwell v. City of Albuquerque*, 97 N.M. 136, 138, 637 P.2d 567, 569 (1981). "Although the reviewing court generally may not substitute its judgment for that of the administrative decisionmaker, it may correct the decisionmaker's misapplication of the law." *Id.* (citation omitted).

## II. COLLATERAL ESTOPPEL

■ The issues in this case present several novel questions involving the application of collateral estoppel. We previously noted in *Shovelin v. Central New Mexico Electric Cooperative, Inc.*, 115 N.M. 293, 297, 850 P.2d 996, 1000 (1993), that the doctrine of collateral estoppel promotes judicial economy by preventing the relitigation of ultimate facts

or issues actually litigated and necessarily decided in a previous suit. In order for the court to apply collateral estoppel, or "issue preclusion," the moving party must show that:

> (1) the party to be estopped was a party [or privy] to the prior proceeding, (2) the cause of action in the case presently before the court is different from the cause of action in the prior adjudication, (3) the issue was actually litigated in the prior adjudication, and (4) the issue was necessarily determined in the prior litigation.

*Id.* If the moving party demonstrates each element of this test, the court must then determine whether the non-moving party "had a full and fair opportunity to litigate the issue in prior litigation." *Id.; see also Silva v. State*, 106 N.M. 472, 474, 745 P.2d 380, 382 (1987).

In *Shovelin* we addressed for the first time whether the doctrine of collateral estoppel precluded relitigation of issues resolved in an administrative agency adjudicative decision. After reviewing other jurisdictions and authorities on the issue, we concluded that "administrative adjudicative determinations may be given preclusive effect if rendered under conditions in which the parties have the opportunity to fully and fairly litigate the issue at the administrative hearing." *Shovelin*, 115 N.M. at 298, 850 P.2d at 1001.

### A. Collateral Estoppel and Arbitration

■ Now we must consider as a matter of first impression the threshold question of whether the doctrine of collateral estoppel applies to arbitration awards. *See, Sundance Mechanical & Util. Corp. v. Atlas*, 118 N.M. 250, 254, 880 P.2d 861, 865 (1994) (noting but declining to reach this issue). Fortunately, this Court has already examined a closely related issue: the nature and degree of judicial review the courts should give to arbitration awards. In *Fernandez v. Farmers Insurance Co.*, 115 N.M. 622, 625, 857 P.2d 22, 25 (1993), we reaffirmed "the strong public policy in this state ... in favor of resolution of disputes through arbitration." We noted that the arbitration process "allows

---

**2.** Initially, Rex appealed on a third ground as well, arguing that MHD Regulation 207 conflict-

ed with the Uniform Commercial Code. However, Rex abandoned this claim at oral argument.

for the informal, speedy, and inexpensive final disposition of disputes, and also aids in relieving the judiciary's heavily burdened caseload." *Id.* (citations omitted). Therefore, we concluded that "[i]n order to promote judicial economy ..., the finality of arbitration awards [should be] enforced by strict limitations on court review of those awards." *Id.* These considerations similarly support applying collateral estoppel to issues necessarily decided by arbitration as if they were determined by a court. Thus, we hold that "[w]hen arbitration affords opportunity for presentation of evidence and argument substantially similar in form and scope to judicial proceedings, the award should have the same effect on issues necessarily determined as a judgment has." Restatement (Second) of Judgments § 84 cmt. c (1980).

We note that other jurisdictions that have considered the application of collateral estoppel to arbitration awards have reached a similar conclusion. *See, e.g., In re American Ins. Co.,* 43 N.Y.2d 184, 401 N.Y.S.2d 36, 38–39, 371 N.E.2d 798, 801 (1977) ("Fundamental to our consideration of the present appeal is recognition that in general the doctrines of claim preclusion and issue preclusion between the same parties (more familiarly referred to as res judicata or direct estoppel) apply as well to awards in arbitration as they do to adjudications in judicial proceedings." (Footnote omitted)); *Neff v. Allstate Ins. Co.,* 70 Wash.App. 796, 855 P.2d 1223, 1225–26 (Ct.App.1993) (noting that an arbitration proceeding can be the basis for collateral estoppel when the parties received a full and fair opportunity to litigate the issues), *review denied,* 123 Wash.2d 1004, 868 P.2d 872 (1994); *Manu–Tronics, Inc. v. Effective Management Sys., Inc.,* 163 Wis.2d 304, 471 N.W.2d 263, 266 (Ct.App.) ("Essential to arbitration remaining useful is the elementary principle that the doctrines of res judicata and collateral estoppel are applicable to arbitration awards."), *review denied,* 475 N.W.2d 164 (Wis.1991). *See also* Restatement (Second) of Judgments § 84 (1980); Hiroshi Motomura, *Arbitration and Collateral Estoppel: Using Preclusion to Shape Procedural Choices,* 63 Tul.L.Rev. 29, 33–36 (1988) (listing use of collateral estoppel for arbitration in other jurisdictions).

█ Of course, in order for a court to apply collateral estoppel to an arbitration proceeding, the movant must still demonstrate the elements of collateral estoppel: the non-movant must be a party or privy to the prior proceeding; the present cause of action must be different from the one in the prior adjudication; and the issue to be precluded must have been actually litigated and necessarily determined in the prior litigation. In addition, because arbitration proceedings tend to be more informal than judicial proceedings, with fewer procedural safeguards, the court should be particularly vigilant in examining whether the arbitration proceeding provided the parties with a full and fair opportunity to litigate the issues. The Court in *Shovelin* set out a non-exhaustive list of factors to be weighed in making such a determination for administrative hearings which are equally applicable to arbitration decisions. These factors included whether the non-movant had the incentive to vigorously litigate the prior action, whether procedural differences between the two actions, such as representation by counsel, presentation of evidence, questioning of witnesses, and appellate review, would make preclusion unfair, and whether policy considerations exist to deny any preclusive effect. *Shovelin,* 115 N.M. at 299–301, 850 P.2d at 1002–04. Additionally, the formality of the proceedings, the scope of the arbitration, and the definiteness of the decision will influence whether an arbitrator's factual findings should be given preclusive effect. Restatement (Second) of Judgments § 84 cmt. c (1980).

## B. Arbitration of Statutory Rights

█ Having established that an arbitration decision should be given issue-preclusive effect under appropriate circumstances, we turn to the main issue in contention: Can a private arbitration award bind an administrative body? The MHC argues that a private arbitration decision should not preclude an administrative agency when it is enforcing statutory rights. For support, the MHC cites to a trilogy of U.S. Supreme Court cases denying preclusive effect to arbitration awards, *Alexander v. Gardner–Denver Co.,*

415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), and *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). All three cases involved a similar set of circumstances. In each case, an employee who claimed he was wrongfully discharged was forced to submit his claim to binding arbitration under his union's collective bargaining agreement. After losing in arbitration, the employee filed a federal suit claiming violation of a statutory right. *Gardner–Denver,* 415 U.S. at 39–43, 94 S.Ct. at 1015–17 (asserting Title VII claim); *Barrentine,* 450 U.S. at 730–32, 101 S.Ct. at 1439–40 (claiming violation of the Fair Labor Standards Act); *McDonald,* 466 U.S. at 286, 104 S.Ct. at 1801 (alleging violation of 42 U.S.C. § 1983). Under these circumstances the U.S. Supreme Court refused to give the arbitration decision any preclusive effect in the subsequent suit involving the plaintiff's statutory rights. The Court held in each case that the arbitration proceedings required under the collective bargaining agreement did not provide an adequate forum for protecting the federal rights that statutes were designed to safeguard. *See McDonald,* 466 U.S. at 289–90, 104 S.Ct. at 1802–03 (reaffirming the holding of the two prior cases). It therefore allowed the individuals to pursue their statutory claims despite the prior arbitration.

However, this trilogy of cases differs significantly from the case before us. As the Court later explained in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991),

First, [*Gardner–Denver, Barrentine,* and *McDonald* ] did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded

subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case.

*Id.* at 35, 111 S.Ct. at 1657. The *Gilmer* Court emphasized that, in the *Gardner–Denver* trilogy, the employees' contractual rights under the collective bargaining agreement were distinct from their statutory rights. Therefore, in bringing suit, the employees were not seeking review of the arbitrator's decision but were instead asserting independent statutory rights. *Id.* at 34, 111 S.Ct. at 1656.[3]

Although *Gilmer* involved a different issue, whether an agreement to arbitrate statutory rights should be enforced, *id.* at 26, 111 S.Ct. at 1652, its analysis distinguishing the *Gardner–Denver* trilogy is applicable to the present case. Unlike the proceedings in the *Gardner–Denver* line of cases, Atkins and Rex specifically agreed to arbitrate their statutory claims and the arbitrator was authorized to resolve those claims. In addition, Rex and Atkins were in control of their arbitration claims, as opposed to the union-controlled grievance process in the *Gardner–Denver* cases. Thus the factors in *Gardner–Denver* that compelled the U.S. Supreme Court to deny preclusive effect to arbitration with respect to statutory rights are absent here, and the holding of *Gardner–Denver* is

---

**3.** In the *Gardner–Denver* line of cases, the Court also expressed several misgivings about the arbitration process which it cited as support for denying preclusive effect to arbitration. *McDonald,* 466 U.S. at 290–91, 104 S.Ct. at 1803–04 (reiterating the findings of the earlier cases). However, the Supreme Court has since reconsidered these misgivings. In *Gilmer,* the Court noted, "[W]e are well past the time when judicial

suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." *Gilmer,* 500 U.S. at 34 n. 5, 111 S.Ct. at 1656 n. 5 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626–27, 105 S.Ct. 3346, 3353–54, 87 L.Ed.2d 444 (1985)).

inapplicable to this case. Accordingly, the fact that Atkins' arbitration proceedings involved statutory rights is not sufficient, in itself, to deny issue preclusive effect because she specifically agreed to arbitrate the statutory claims. As the *Gilmer* Court noted, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)).

## C. Privity Between Agencies and Private Parties

▮ The MHC next argues that it cannot be collaterally estopped by the arbitration agreement between Rex and Atkins because it was not a party or privy to the proceedings. The MHC cannot be deemed a party to the first cause of action, having not participated in the private suit or in the subsequent arbitration proceedings. However, it may still be bound as a privy of Atkins. The concept of privity with respect to issue preclusion has been defined as "that relationship between two parties which is sufficiently close so as to bind them both to an initial determination, at which only one of them was present." *NLRB v. Donna–Lee Sportswear Co.*, 836 F.2d 31, 35 (1st Cir.1987) (applying issue preclusion to the NLRB); *see also First Alabama Bank v. Parsons Steel, Inc.*, 747 F.2d 1367, 1378 (11th Cir.1984) ("A finding of privity is no more than a finding that all of the facts and circumstances justify a conclusion that non-party preclusion is proper."), *rev'd on other grounds*, 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986); 1B James W. Moore et al., Moore's Federal Practice ¶ 0.411[1], at III–215 (2d ed. 1994) (noting that privity has generally been found to exist between parties who are representing the interests of the same individual).

Although the question of privity between an agency and a private individual is new to New Mexico, it has previously been examined in several federal cases that provide us with guidance. In *EEOC v. Kimberly–Clark Corp.*, 511 F.2d 1352, 1361 (6th Cir.), *cert. denied*, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975), the court considered whether the principles of res judicata or collateral estoppel barred the EEOC from bringing a claim of sex discrimination against Kimberly–Clark based on a prior private claim that had already been settled by the private parties. The court concluded that the EEOC was not a privy to the earlier settlement agreement because "the EEOC sues to vindicate the public interest, which is broader than the interests of the charging parties." *Id.* Thus the court held that the EEOC was not barred by res judicata from using the earlier charges against Kimberly–Clark as a basis for its complaint. *Id.*

The court in *EEOC v. McLean Trucking Co.*, 525 F.2d 1007, 1009 (6th Cir.1975), addressed a similar situation when the EEOC charged McLean Trucking with violating Title VII. The EEOC charge was based on the complaint of an individual who had already accepted an arbitration award in settling his private suit against McLean Trucking. The *McLean Trucking* court followed the *Kimberly–Clark* decision, stating:

> EEOC argues that neither the acceptance of the arbitration award nor the filing or settlement of a separate action by Brown, the charging party, precludes EEOC's right to bring an action in the public interest to eliminate discriminatory practices uncovered during investigation of the Brown charge. With this position we agree.

*McLean Trucking*, 525 F.2d at 1010.

In *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1541–42 (9th Cir.1987), the court examined a related question whether an employee's settlement with her employer rendered an EEOC action based on her complaint moot. The court noted that although the employee's personal claims were rendered moot,

> [t]he EEOC's right of action is independent of the employee's private action rights. The EEOC "is not merely a proxy for the victims of discrimination," but "acts also to vindicate the public interest in preventing employment discrimination." Its interests in determining the legality of specific conduct and in deterring future viola-

tions are distinct from the employee's interest in a personal remedy.

*Id.* at 1543 (quoting *General Tel. Co. v. EEOC,* 446 U.S. 318, 326, 100 S.Ct. 1698, 1704, 64 L.Ed.2d 319 (1980)) (citation omitted). Therefore, the court concluded: "By seeking injunctive relief 'the EEOC promotes public policy and seeks to vindicate rights belonging to the United States as sovereign.' ... [The employee's] settlement does not moot the EEOC's right of action seeking injunctive relief to protect employees as a class and to deter the employer from discrimination." *Id.* Although the court cast the issue in terms of mootness, the same considerations apply in determining whether an agency's action is precluded by the private settlement. *See Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 694 (7th Cir.1986) (en banc) (holding that in an ERISA claim, the Secretary of Labor's interest is separate and distinct from the private plaintiffs' interests and thus cannot be barred by the doctrine of res judicata after the private plaintiffs settle); *Donovan v. Cunningham,* 716 F.2d 1455, 1462–63 (5th Cir.1983) (noting in an ERISA claim that because the Secretary of Labor seeks to vindicate a broader public interest than the private litigants, the Secretary is not precluded from relitigating issues litigated in a prior private action), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

■ These cases persuade us that an agency, enforcing a statutory scheme, is not in privity with the private complainant when the agency is acting to vindicate a broader public interest protected under the statute. Therefore, the agency cannot be bound by a private settlement to the extent that the settlement would prevent the agency from protecting that public interest. However, different considerations apply when the agency is acting solely for the private benefit of the complaining individual and is seeking a remedy which only benefits that individual.

The court in *EEOC v. United States Steel Corp.,* 921 F.2d 489, 491 (3d Cir.1990) articulated this distinction in considering an EEOC action to recover pension benefits for a group of employees who had already settled their pension-benefit claims. In that case, the EEOC argued that it was not in privity with the individual grievants when it sought enforcement of the Age Discrimination in Employment Act on their behalf because it was protecting a broader public interest. *Id.* at 496. The court, however, held:

> The Commission's description of its enforcement role under the ADEA is accurate and important, but this description fails to distinguish between the EEOC's role in protecting the public interest and its role in vindicating specific private claims. While it is true that the Commission has the responsibility to protect a vital public interest that transcends the interests of any or all aggrieved individuals, we have concluded ... that the Commission's responsibilities include the representation of these grievants when it seeks individual relief on their behalf. Thus, when the Commission seeks individualized benefits under the ADEA for particular grievants, as it did in this case, the Commission functions to that extent as their representative, and the doctrine of representative claim preclusion applies.

*Id.*

This public interest-private benefit distinction was first noted in dicta by the court in *Kimberly–Clark.* As discussed earlier, that court held that the EEOC was not barred by res judicata from pursuing its claim against Kimberly–Clark because it sought to vindicate the public interest. However, the court went on to note that an earlier settlement by the grievants "may well limit the scope of relief that the EEOC may seek for the [grievants'] private benefit." *Kimberly–Clark,* 511 F.2d at 1361. The court in *Goodyear Aerospace* subsequently applied this distinction under similar circumstances, noting that although the EEOC's action was not rendered moot by the settlement, its claim for back pay on the claimant's behalf was moot. The court held: "[A]ny recovery of back pay by the EEOC would go directly to [the claimant] who has freely contracted away her right to back pay. Under these circumstances, the public interest in a back pay award is minimal." *Goodyear Aerospace,* 813 F.2d at 1543; *see also FTC v. AMREP Corp.,* 705 F.Supp. 119, 124

(S.D.N.Y.1988) (noting that the Federal Trade Commission's suit was barred to the extent that it sought redress for purchasers who had already settled their private claims); *EEOC v. American Fed'n of Gov't Employees Local 1617,* 657 F.Supp. 742, 750–51 (W.D.Tex.1987) (noting that because the EEOC's claim was no broader than the private grievant's claim that had already been settled, the EEOC's claim was moot); *Brooks v. Stroh Brewery Co.,* 95 N.C.App. 226, 382 S.E.2d 874, 883–84 (holding that the Commissioner of Labor's action for back pay under the Occupational Safety and Health Act of North Carolina was barred by a private settlement), *review denied,* 325 N.C. 704, 388 S.E.2d 449 (1989). *But see EEOC v. Dayton Tire & Rubber Co.,* 573 F.Supp. 782, 786–87 (S.D.Ohio 1983) (holding that EEOC's claim for greater back pay than that awarded in settlement was not barred because it vindicated the public interest through deterrence).

■ Accordingly, we are persuaded that when an agency acts on behalf of an individual claimant and seeks individual relief, it is in privity with that claimant and may be barred under the doctrine of collateral estoppel. However, the agency will be precluded only to the extent that it is not acting to vindicate the public interest.[4]

■ In the case at bar the MHC argues that the purpose of the Manufactured Housing Act is to protect the general public. It therefore claims that by enforcing the Act, it is acting on behalf of the public interest. We agree that the Act expresses a strong consumer protection policy. It provides in part:

4. We note that the relevant cases focusing on this question have not consistently framed the issue in terms of privity. However, we conclude that the issue is best analyzed under that rubric. The common thread running through the various decisions limiting an agency's statutory claim is the courts' recognition that the agency is in fact acting on behalf of an individual claimant, as that claimant's representative. *See* 1B Moore, *supra,* ¶ 0.411[12] n. 39, at III–291 ("In some cases an agency may act on complaint or otherwise pursue recovery on the part of individuals injured by infractions of the law. In such a case the government and the represented person are in privity and a judgment has res judicata effect.").

The purpose of the Manufactured Housing Act [this article] is to insure the purchasers and users of manufactured homes the essential conditions of health and safety which are their right and to provide that the business practices of the industry are fair and orderly among the members of the industry with due regard to the ultimate consumers in this important area of human shelter.

NMSA 1978, § 60–14–3 (Repl.Pamp.1989) (alteration in original). We also agree generally that when the MHC enforces the Act and the regulations promulgated thereunder, it is acting to vindicate an important public interest. Accordingly, the MHC's conclusion that Rex violated MHD Regulation 207(B) and its decision to place Rex's license on probation for six months cannot be barred by Atkins' arbitration because the probation serves the public interest. However, the same cannot be said for the MHC's order requiring Rex to pay Atkins.

■ In the earlier proceedings the arbitrator concluded that, under MHD Regulation 207(B), Atkins was only entitled to the remaining portion of her deposit less Rex's expenses of $3,724.24. The MHC, however, continued to pursue the 207(B) claim on Atkins's behalf for the $3,724.24 already resolved by arbitration. Yet, the benefit arising out of Rex's return of the remaining portion of the deposit would inure solely to Atkins. The public interest in such an award is clearly minimal. Accordingly, the MHC should have been found to be in privity with Atkins with respect to its claim for the return of the $3,724.24.

In addition, although this question of privity has arisen more commonly in the context of analyzing claim preclusion, the general rule framed by the federal courts is equally applicable in examining privity under issue preclusion. *See* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4475, at 771–72 (1981) ("Thus issue preclusion is properly extended to bind or benefit nonparties who are closely related to the arbitration or the parties, so as to ensure reasonable finality to the award."). *Cf. Kimberly–Clark,* 511 F.2d at 1361 (examining both claim and issue preclusion).

Although a finding of privity does not end our inquiry into whether the doctrine of collateral estoppel applies, privity was the only element of collateral estoppel contested by the MHC. Therefore, we shall discuss the other elements only briefly. First, we note that the cause of actions in the two disputes are different. The arbitration involved a private cause of action for recovery of damages, whereas the administrative action was a disciplinary proceeding. Second, the issue of how much relief Atkins was entitled to under MHD Regulation 207(B) was actually litigated in the arbitration proceedings and the arbitrator reached a clear and unequivocal conclusion that necessarily determined the issue in Rex's favor. Indeed, this issue was one of the main areas of contention between the parties in the arbitration.

Third, it is clear that Atkins had a full and fair opportunity to litigate the issues in the prior hearing. Atkins had ample incentive to litigate the prior action. The arbitration was her only chance to personally enforce her claim for damages under 207(B). She had no control over whether the MHC would pursue a disciplinary action against Rex nor over its choice of enforcement measures. In the arbitration the parties were represented by counsel and were given an opportunity to present evidence and argument. The arbitrator in this case was an attorney and was specifically authorized to rule on the statutory question of the application of MHD Regulation 207(B), which both parties stipulated was controlling. Further, his decision included extensive findings of fact in support of his conclusion. Accordingly, all the requirements of collateral estoppel are met and the MHC is estopped from proceeding by the prior arbitration award with respect to the disposition of the refund.

D. Waiver

██ The MHC next argues that, even if the elements of collateral estoppel are met, Rex waived his right to assert collateral estoppel by expressly consenting to the MHC proceeding. The MHC points to the settlement agreement between Rex and Atkins in which the parties agreed that "[t]he State will make its own determination on whether it wishes to proceed." The MHC argues that with this statement Rex expressly consented to the relitigation of all issues by the MHC. However, this argument lacks merit. The relevant portion of the agreement states,

> We have agreed that Ms. Atkins will not request the State suspend the licensing proceedings, however we also agreed that Ms. Atkins will not actively pursue or encourage those proceedings either. The State will make its own determination on whether it wishes to proceed. Ms. Atkins will of course, testify if asked to do so by either party.

When read in context, it is apparent that the statement is merely an agreement by Atkins not to take any further action with regard to the MHC investigation and an acknowledgement that the parties have no control over the MHC's decision to pursue disciplinary action. The agreement makes no reference at all to collateral estoppel nor to a waiver of any defense.

An analogous argument was rejected in *Deutsch v. Flannery*, 823 F.2d 1361 (9th Cir.1987). In *Deutsch*, defendants stated that they "would 'not oppose [plaintiff's] right to file a new complaint arising out of the matters involved in the case,'" when plaintiff decided not to appeal the court's dismissal without prejudice of its claim. *Id.* at 1364 n. 2. The court noted that the letter made no mention of issue preclusion and that it was improbable that defendants would waive issue preclusion when plaintiff was entitled to refile the dismissed complaint. Accordingly, the court held that this statement was not a waiver, and instead merely confirmed "the uncontroversial legal proposition that [plaintiff] had the right to file a new action." *Id.* Similarly, we cannot read the agreement between Rex and Atkins as constituting any express waiver of the defense of collateral estoppel.

██ Finally, the MHC contends that collateral estoppel should not affect its order against Rex because MHD Regulation 207(C) provided an alternate basis for its ruling. MHD Regulation 207(C) states that when no purchase is made, the buyer's deposit must be refunded within five days. The MHC found, and Rex does not contest, that several

months passed before Rex returned any portion of Atkins' deposit in violation of MHD Regulation 207(C). The MHC argues that this conclusion is sufficient to support its decision, including its order requiring Rex to return the remaining deposit money to Atkins and its order attaching Rex's consumer protection bond for that amount. However, the portion of the Manufactured Housing Act governing consumer protection bonds provides that such bonds serve "as *indemnity* for any loss sustained by any person damaged ... as a result of a violation of any regulation adopted by the division." NMSA 1978, § 60–14–6(A) (Repl.Pamp.1989) (emphasis added). Accordingly, for a violation of MHD Regulation 207(C), the MHC was only entitled to attach Rex's consumer protection bond to the extent Atkins was damaged by the delay in the return of her deposit, and it could only require that amount be returned to Atkins. In addition, while the MHC could properly suspend Rex's license for a violation of MHD Regulation 207(C), it could not condition the staying of the suspension on the return of the $3,724.24.

Thus, Rex's violation of MHD Regulation 207(C) does serve as an alternate basis for the MHC's order but only to the extent that the order compensates Atkins for her losses due to that violation. However, because the order does not draw any distinction between Atkins' losses resulting from the two violations, and because the losses are not coextensive, that portion of the order awarding a refund to Atkins cannot stand based on MHD Regulation 207(C) alone. Accordingly, paragraphs 1, 2, and 3 of the order—the paragraphs requiring Rex to pay Atkins $3,724.24 and imposing a thirty day suspension of Rex's dealer's license contingent upon payment—are reversed and remanded back to the MHC for redetermination in light of our holding that collateral estoppel bars any award of money to Atkins based on the violation of MHD Regulation 207(B). Paragraph 4 of the order placing Rex's dealer's license on probation for six months is affirmed. We note that this opinion does not affect the MHC's determination that Rex violated MHD Regulation 207(B) and 207(C), and, consequently, upon remand the MHC is still entitled to discipline Rex, if it deems necessary, using the full panoply of measures under the Manufactured Housing Act designed to vindicate the public interest, including probation, license suspension, and civil penalties.

## III. PEREMPTORY DISQUALIFICATIONS

█ Rex's second claim of error on appeal is that the MHC violated the Uniform Licensing Act, NMSA 1978, § 61–1–7(C) (Repl.Pamp.1989), by allowing Rex only one peremptory disqualification of a committee member at the hearing. At the time of the hearing Section 61–1–7(C) provided:

Any board member or hearing officer may be disqualified by the filing of an affidavit of disqualification *as in the case of judges,* but this privilege of disqualification by affidavit may not be exercised in any case in which its exercise would result in less than a quorum of the board being able to hear or decide the matter. Any disqualification of a board member which would result in less than a quorum of the board being able to hear or decide the matter shall only be for good cause shown to the board, and in any case in which a combination of disqualifications by affidavit and for good cause would result in less than a quorum of the board being able to hear or decide the matter, the disqualification or disqualifications by affidavit which would result in removing the member or members of the board necessary for a quorum shall not be effective.

*Id.* (emphasis added). The MHC noted that the sentence allowing for disqualification by affidavit included the language "as in the case of judges." The MHC interpreted this language to mean that it should follow the rules governing disqualification of judges. The relevant statute on disqualification of district court judges, NMSA 1978, § 38–3–9 (Repl.Pamp.1987), provides, in relevant part: "A party to an action or proceeding, civil or criminal, ... shall have the right to exercise a peremptory challenge to the district judge before whom the action or proceeding is to be tried and heard.... Each party to an action or proceeding may excuse only one district judge pursuant to the provisions of

this statute." *See also* SCRA 1986, Rule 1–088.1(A) (Repl.Pamp.1992) ("No party shall excuse more than one judge."). Accordingly, the MHC permitted Rex only one disqualification by affidavit.

Rex counters that the phrase "as in the case of judges" should be read to modify the phrase "filing of an affidavit of disqualification" and should be viewed as merely providing guidance in the method of preparing affidavits. *See* NMSA 1978, § 38–3–10 (Repl.Pamp.1987) (discussing timing for filing an affidavit). Rex also points to the portion of the statute reading, "the disqualification *or disqualifications* by affidavit which would result in removing the member or members of the board necessary for a quorum shall not be effective." Section 61–1–7(C) (emphasis added). Rex argues that the phrase "or disqualifications" indicates that the legislature contemplated allowing more than one peremptory disqualification.

In contrast, the MHC argues that the legislature inserted "or disqualifications" in recognition of the fact that more than one party may appear before the board and assert a peremptory disqualification. It points out that this interpretation comports with the rule discussing peremptory disqualification of judges in which each party has the right to an excusal. *See* § 38–3–9; SCRA 1986, Rule 1–088.1(B).

▆ We find that the use of the phrase "as in the case of judges" is ambiguous as to what it modifies and to what it refers. "A statute is ambiguous when it can be understood by reasonably well-informed persons in two or more different senses." *State v. Elmquist*, 114 N.M. 551, 552, 844 P.2d 131, 132 (Ct.App.1992). When a statute is ambiguous, it is within the authority of the agency charged with effecting that statute to interpret it. *See State ex rel. Helman v. Gallegos*, 117 N.M. 346, 357, 871 P.2d 1352, 1363 (1994). "Additionally, a reviewing court may, where appropriate, accord substantial weight to the interpretation given a statute or regulation by a body charged with administering such law." *State ex rel. Battershell v. City of Albuquerque*, 108 N.M. 658, 662, 777 P.2d 386, 390 (Ct.App.1989); *see also New Mexico Pharmaceutical Ass'n v. State*, 106 N.M. 73,

75, 738 P.2d 1318, 1320 (1987) (administrative interpretations are persuasive). "However, a reviewing court will overturn a clearly incorrect administrative interpretation." *New Mexico Pharmaceutical Ass'n*, 106 N.M. at 75, 738 P.2d 1318.

We find that the MHC's interpretation of the statute is reasonable and facilitates the operation and achievement of the goals of the statute. *Cf. Roberts v. Southwest Community Health Servs.*, 114 N.M. 248, 251, 837 P.2d 442, 445 (1992) ("Statutes should be construed so as to facilitate their operation and the achievement of the goals as specified by the legislature."). In providing for peremptory disqualification, the legislature intended to allow the parties some control over the makeup of the tribunal without having to meet the rigors of showing disqualification for cause. It did not intend to hamper the agency's ability to enforce the statutes. To read this statute as allowing more than one peremptory disqualification, however, would lead to contrary results. In the case in which the board has assigned a hearing officer to oversee the proceedings, permitting unlimited challenges would allow a party the opportunity to delay the hearing unnecessarily through repeated disqualifications. *Cf. Rocky Mountain Life Ins. Co. v. Reidy*, 69 N.M. 36, 41, 363 P.2d 1031, 1035 (1961) (noting potential for abuse with successive disqualifications). In addition, because peremptory challenges cannot be used to reduce the number of committee members below a quorum, in the case of multiple parties appearing before the board, one party could usurp all the available peremptory challenges by filing multiple affidavits first.

Rex suggests that this Court previously affirmed the use of multiple disqualifications under Section 61–1–7 in *Reid v. New Mexico Board of Examiners in Optometry*, 92 N.M. 414, 589 P.2d 198 (1979). The *Reid* opinion does make reference to the plaintiff having disqualified two board members under Section 61–1–7. *Id.* at 415, 589 P.2d at 199. However, the opinion does not disclose whether those disqualifications were peremptory or for cause, the latter of which would still be permissible under the MHC's interpretation. More importantly, this reference,

appearing in the facts of the case, is mere dictum. The Court clearly did not address the propriety of multiple peremptory disqualifications or the proper interpretation of the statute. Thus *Reid* is inapposite. Accordingly, we affirm the MHC's decision holding that a party is entitled to only one peremptory challenge.

## IV. CONCLUSION

For the foregoing reasons we affirm the MHC's decision to allow Rex only one peremptory challenge, and we reverse paragraphs 1, 2, and 3 of the MHC's order requiring Rex to pay Atkins $3,724.24 and imposing a thirty-day suspension of Rex's dealer's license to be stayed upon payment, and remand the order for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

RANSOM and FRANCHINI, JJ., concur.