2004 UT 78

**Perry BUCKNER, et al., Plaintiffs and Appellees,**

v.

**Aaron KENNARD, as Sheriff of Salt Lake County, Salt Lake County, Salt Lake County Sheriff's Office, and Salt Lake County Deputy Sheriff's Merit Service Commission, Defendants and Appellants.**

No. 20020178.

Supreme Court of Utah.

Sept. 17, 2004.

Byron J. Benevento, Michael R. Johnson, Salt Lake City, for plaintiffs.

David E. Yocom, John P. Soltis, Valerie Wilde, Salt Lake, for defendants.

DURHAM, Chief Justice:

¶ 1 Plaintiffs (the deputies) are all employees of the Salt Lake County Sheriff's Office. The deputies filed suit against the defendants Sheriff Aaron Kennard, Salt Lake County, the Salt Lake County Sheriff's Office, and the Salt Lake County Deputy Sheriffs' Merit Service Commission (collectively, the county), seeking back wages as a remedy for their claims of pay inequity under the civil service statutes, breach of contract, and negligent misrepresentation. The claims arose after the county instituted a new pay plan in 1988, which credited law enforcement experience outside the sheriff's office more heavily than experience within the office in determining pay rates.

¶ 2 The trial court granted partial summary judgment for the deputies on grounds of collateral estoppel, based on an arbitration that had taken place in an earlier suit by a different group of deputies. *Diamant v. Kennard*, No. 92–0901549 CV (Utah Third Jud. Dist. Dec. 19, 1994) (order of dismissal with prejudice). In its decision, the trial court also held that the deputies (1) were not barred by the Governmental Immunity Act, Utah Code Ann. § 63–30–10(1), from bringing a claim of statutory entitlement, and (2) had stated a claim for breach of contract. The county appeals the final judgment and the interlocutory rulings that merged into it.

## BACKGROUND

¶ 3 In November 1988, a pay plan was instituted for deputy sheriffs in the Salt Lake County Sheriff's Office that included a new formula for factoring past experience when determining salary increases and promotions. The formula increased the credit for prior law enforcement experience for those hired from outside the county, as compared to those already working for the county. In effect, those with experience in law enforcement outside the Sheriff's Office would receive higher pay than those with the same amount of experience inside the county. In 1990, the county began receiving complaints

about disparities in pay between employees whose job experience and position were more or less similar. In response, the Salt Lake County Deputy Sheriffs' Merit Commission (the Commission) established a Pay Equity Committee (the Pay Committee) to evaluate the problem, and the Pay Committee issued the Pay Equity Committee Report (the Report) in April 1991. The Report concluded that pay disparities between otherwise equivalent employees did exist and identified six contributing factors, including the method of crediting prior service. The Report also recommended measures to bring all employees of the Sheriff's Office to parity in pay rates. However, the county did not implement a new pay plan addressing the disparities until September 1, 1994. The 1994 pay plan is not at issue in this case.

## I. THE DIAMANT ARBITRATION

¶ 4 On April 30, 1991, a group of deputies including Kathryn Diamant (the "Diamant group," distinct from the present plaintiffs), filed a notice of claim for a wage dispute. In March 1992, the Diamant group filed suit against Salt Lake County, claiming (1) pay inequity under the County Personnel Management Act (CPMA), (2) constitutional tort, (3) violation of the federal Equal Pay Act, and (4) civil rights violations under the United States and Utah Constitutions. In March 1994, the parties agreed to dismiss the discrimination, Equal Pay Act and constitutional claims and to submit the CPMA claim to binding arbitration. On August 15, 1996, the arbitrator issued a ruling finding that "gross pay inequities" existed and establishing a formula for recompensing the individual Diamant group plaintiffs. The arbitrator issued a final decision in November 1996, awarding back pay for the period from 1990 to 1994 to the Diamant group.

## II. THE BUCKNER PLAINTIFFS

¶ 5 On January 6, 1995, the county sent a letter to other deputies who had filed pay equity grievances, stating that the results of the Diamant arbitration (then ongoing) would not apply to anyone who had not been part of the Diamant suit. In August 1995, nineteen of these deputies, including Buckner, filed a notice of claim alleging pay inequities. On January 23, 1996, these nineteen filed the instant suit, claiming both pay inequity and negligent misrepresentation.[1] Forty-five deputies joined the suit on February 20, 1996. A third amended complaint was filed in August 1996, adding sixty more deputies as plaintiff, for a total of 124, and including a breach of contract claim.

¶ 6 The county filed a motion to dismiss. The first judge assigned to the case denied the county's motion, ruling that the deputies' pay equity claim was not barred by section 63–30–10(1) of the Governmental Immunity Act (GIA) and that they had pled facts sufficient to state a claim for breach of contract. Subsequently, the case was reassigned to another trial judge, who held that the prior judge's ruling on the motion to dismiss established the "law of the case." The court then granted partial summary judgment for the deputies on the pay equity and breach of contract claims, basing its ruling on collateral estoppel stemming from the Diamant arbitration.[2] The court then held a bench trial on the question of back pay awards to the individual deputy plaintiffs, ultimately awarding back pay to ninety-two of them. The county appeals from that judgment.

## III. ISSUES ON APPEAL

¶ 7 The county presents nine issues on appeal, arguing that (1) failure to comply with the notice provisions of the Governmental Immunity Act bars 105 of the plaintiff deputies from pursuing their statutory equitable pay claim, (2) the second trial judge erroneously applied the law of the case doctrine, (3) the trial court erred in holding that, under the doctrine of collateral estoppel, the Diamant arbitration barred the county's defenses to the contract and statutory wage

1. The negligent misrepresentation claim was dismissed by the trial court and was not appealed.

2. The Diamant arbitration did not include a breach of contract claim. Thus, even if the trial

court had properly interpreted the "law of the case" doctrine, its application of collateral estoppel to the contract claim would be erroneous.

claims in this litigation, (4) the statutes and policies referring to "equitable" pay for Salt Lake County deputies do not create an enforceable employment contract, (5) in any case, the deputies have no private statutory right of action under these statutes and policies to sue for pay equity and seek back pay as damages, (6) the county is immune to this suit because its adoption and use of a pay plan for deputies is a governmental function under section 63–30–3(1) of the GIA, (7) if a private statutory right of action exists, the county is entitled to judgment because it fully complied with the applicable statutes and policies, (8) if a right of action exists, the suit is barred because the statute of limitations for statutory actions expired in 1991, and (9) the trial court erroneously awarded pre-judgment interest on the back wages in this case.

¶ 8 Because we decide issues two, three, four, and five above—concerning the law of the case doctrine, collateral estoppel, the implied employment contract for deputies, and the existence of a statutory private right of action—in favor of the county, we need not reach the remainder of the issues presented.

## STANDARD OF REVIEW

¶ 9 The propriety of a trial court's denial of a motion to dismiss is a question of law that we review for correctness. *Cruz v. Middlekauff Lincoln–Mercury, Inc.*, 909 P.2d 1252, 1253 (Utah 1996). Only if it is clear that the claimant is not entitled to relief under any state of facts that could be proven to support the claim should a motion to dismiss be granted. *Colman v. Utah State Land Bd.*, 795 P.2d 622, 624 (Utah 1990).

¶ 10 Additionally, summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). We accord no deference to the trial court's conclusions of law, and review them for correctness. *Gottling v. P.R. Inc.*, 2002 UT 95, ¶ 5, 61 P.3d 989. We review findings of fact for clear error. *Knight v. Salt Lake County*, 2002 UT App 100, ¶ 6, 46 P.3d 247.

## ANALYSIS

### I. COLLATERAL ESTOPPEL AND ARBITRATION

¶ 11 As indicated above, the trial court held that the Diamant arbitration provided a basis for the application of collateral estoppel in this case, and that the county was therefore precluded from litigating the issue of entitlement to back pay. Challenging this holding, the county contends that because the Diamant proceedings did not result in a final judgment on the merits, the elements of res judicata were not satisfied. The deputies counter that the trial court's preclusive rulings were correct and that because the county lost in the Diamant arbitration proceedings, "it should not get another bite at the apple." The question of whether an arbitration decision may be given preclusive effect is a matter of first impression for this court. For the reasons that follow, we hold that a private arbitration award does not have nonmutual collateral estoppel effect unless the parties expressly provide for such preclusive effect beforehand.

### A. Collateral Estoppel

¶ 12 The doctrine of res judicata embraces two distinct theories: claim preclusion and issue preclusion. *Snyder v. Murray City Corp.*, 2003 UT 13, ¶ 33, 73 P.3d 325 (citing *Salt Lake City v. Silver Fork Pipeline Corp.*, 913 P.2d 731, 733 (Utah 1995)). Claim preclusion involves the same parties or their privies and the same cause of action. It " 'precludes the relitigation of all issues that could have been litigated as well as those that were, in fact, litigated in the prior action.' " *Macris & Assocs. v. Neways, Inc.*, 2000 UT 93, ¶ 19, 16 P.3d 1214 (quoting *Schaer v. State*, 657 P.2d 1337, 1340 (Utah 1983) (citation omitted)). In contrast, issue preclusion, also known as collateral estoppel, "arises from a different cause of action and prevents parties or their privies from relitigating facts and issues in the second suit that were fully litigated in the first suit." *Id.* In effect, once a party has had his or her day in court and lost, he or she does not get a second chance to prevail on the same issues. *Berry v. Berry*, 738 P.2d 246, 249 (Utah

App.1987). In the instant case, the deputies argue that the dispute over pay inequities was resolved in the Diamant arbitration proceedings, and that collateral estoppel therefore precludes the county from relitigating the issue.

■ ¶ 13 A party seeking to invoke collateral estoppel must establish that: (1) the issue decided in the prior adjudication is identical to the one presented in the instant action; (2) the party against whom issue preclusion is asserted was a party, or in privity with a party, to the prior adjudication; (3) the issue in the first action was completely, fully, and fairly litigated; and (4) the first suit resulted in a final judgment on the merits. *Snyder*, 2003 UT 13 at ¶ 35, 73 P.3d 325; *Timm v. Dewsnup*, 851 P.2d 1178, 1184 (Utah 1993).

■ ¶ 14 Application of the doctrine of collateral estoppel may be unwarranted in circumstances where its purposes would not be served. *See Estate of Covington v. Josephson*, 888 P.2d 675, 678 (Utah Ct.App. 1994). These purposes include: (1) preserving the integrity of the judicial system by preventing inconsistent judicial outcomes; (2) promoting judicial economy by preventing previously litigated issues from being relitigated; and (3) protecting litigants from harassment by vexatious litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *State ex rel. J.J.T.*, 877 P.2d 161, 162–63 (Utah Ct. App.1994); *Mel Trimble Real Estate v. Monte Vista Ranch*, 758 P.2d 451, 453 (Utah Ct.App.1988).

¶ 15 Moreover, collateral estoppel can yield an unjust outcome if applied without reasonable consideration and due care. *Parklane Hosiery*, 439 U.S. at 330–31, 99 S.Ct. 645. In particular, allowing a party who took no part in the first suit to take advantage of the findings therein and use them offensively in subsequent litigation can result in adverse, unjust, and unforeseen consequences for the party against whom collateral estoppel has been asserted. *Id.* at 326–33, 99 S.Ct. 645. Courts, then, must carefully consider whether granting preclusive effect to a prior decision is appropriate. *Id.* at 330–31, 99 S.Ct. 645. Collateral estoppel "is not an inflexible,

universally applicable principle[.] . . . [P]olicy considerations may limit its use where the . . . underpinnings of the doctrine are outweighed by other factors." *Jackson v. City of Sacramento*, 117 Cal.App.3d 596, 172 Cal. Rptr. 826, 829 (1981); *see also Estate of Covington*, 888 P.2d at 678; *Parklane Hosiery*, 439 U.S. at 330–31, 99 S.Ct. 645 (indicating that applying collateral estoppel may be unfair where, for example, a party had little incentive to defend vigorously, the judgment relied upon is inconsistent with prior judgments, or different procedural opportunities are offered in each proceeding).

### B. Arbitration

¶ 16 Arbitration is governed by the Utah Uniform Arbitration Act. Utah Code Ann. §§ 78–31a–101 to –131 (2003). The Utah legislature promotes alternative dispute resolution, including arbitration, because it "reduce[s] the need for judicial resources and the time and expense of the parties." *Id.* § 78–31b–3(2)(c). Arbitration is meant

> to offer an alternative or supplement to the formal processes associated with a court trial and to promote the efficient and effective operation of the courts of this state by authorizing and encouraging the use of alternative methods of dispute resolution to secure the just, speedy, and inexpensive determination of civil actions filed in the courts of this state.

*Id.* § 78–31b–3(1).

¶ 17 This court has also recognized the strong public policy favoring arbitration "as an approved, practical, and inexpensive means of settling disputes and easing court congestion." *Chandler v. Blue Cross Blue Shield of Utah*, 833 P.2d 356, 358 (Utah 1992). Arbitration proceedings benefit the parties by providing "a method more expeditious and less expensive [than the court system] for the resolution of disputes." *Docutel Olivetti Corp. v. Dick Brady Sys., Inc.*, 731 P.2d 475, 479 (Utah 1986) (internal quotations and citations omitted); *see also Giannopulos v. Pappas*, 80 Utah 442, 15 P.2d 353, 356 (1932) ("[A]rbitration is favored in the law as a speedy and inexpensive method of adjudicating differences."). The use of arbi-

tration as an alternative to traditional judicial proceedings should therefore be encouraged. *Pac. Dev., L.C. v. Orton,* 2001 UT 36, ¶ 12, 23 P.3d 1035.

¶ 18 Arbitration is "a matter of contract." *Cent. Fla. Invs., Inc. v. Parkwest Assocs.,* 2002 UT 3, ¶ 10, 40 P.3d 599. The parties to the arbitration determine the scope and questions to be resolved during the proceedings and the arbitrator must not exceed the scope defined in the parties' written agreement. *Intermountain Power Agency v. Union Pac. R.R.,* 961 P.2d 320, 323 (Utah 1998). Moreover, arbitration contracts are to be enforced according to their terms, and arbitration proceedings shall be conducted in the manner to which the parties have agreed. *Docutel Olivetti,* 731 P.2d at 480.

## C. Giving Nonmutual Preclusive Effect to an Arbitration Decision

¶ 19 As stated above, whether an arbitration decision should be given collateral estoppel effect is a matter of first impression for this court. Other jurisdictions, however, have decided this question and in making our own determination we will consider their analyses. These decisions can be summarized generally as involving two distinct approaches: the case-by-case approach and the California approach. *See* Brian Levine, *Preclusion Confusion: A Call for Per Se Rules Preventing the Application of Collateral Estoppel to Findings Made in Nontraditional Litigation,* 1999 Ann. Surv. Am. L. 435, 439–45.

¶ 20 As its name implies, the case-by-case approach, followed by a majority of jurisdictions considering the issue thus far,[3] determines on a case-by-case basis whether collat-

eral estoppel effect should be given to a particular arbitration proceeding. *See* Hiroshi Motomura, *Arbitration and Collateral Estoppel: Using Preclusion to Shape Procedural Choices,* 63 Tul. L.Rev. 29, 32–36, 52–53 (1988). After evaluating whether the party seeking to invoke collateral estoppel has established its traditional elements, these courts determine whether the arbitration proceedings provided a full and fair opportunity to litigate the issues. This determination is based on various factors, including: (1) whether the non-moving party had incentive to vigorously litigate the prior action; (2) whether procedural differences, such as representation by counsel, presentation of evidence, questioning of witnesses, and availability of appellate review, would make preclusion unfair; and (3) whether policy considerations exist to deny preclusive effect. *Witkowski v. Welch,* 173 F.3d 192, 199 (3d Cir.1999); *Anderson v. City of Pocatello,* 112 Idaho 176, 731 P.2d 171, 179 (1987); *Aufderhar v. Data Dispatch, Inc.,* 437 N.W.2d 679, 680 (Minn.Ct.App.1989); *Rex, Inc. v. Manufactured Hous. Comm.,* 119 N.M. 500, 892 P.2d 947, 952 (1995).

¶ 21 While the case-by-case approach recognizes that parties benefit from the informal and speedy nature of arbitration and, therefore, voluntarily choose to arbitrate, these courts also examine the extent to which the arbitration proceedings in a particular case gave the parties the opportunity to present evidence and argument in a manner substantially similar to that provided in a judicial proceeding. *Rex,* 892 P.2d at 952; Restatement (Second) of Judgments § 84 cmt. c (1982). Essentially, the more closely the arbitration proceedings resemble those of a typical judicial proceeding, the more likely it

---

**3.** For courts applying collateral estoppel effect to arbitration, *see Witkowski v. Welch,* 173 F.3d 192 (3d Cir.1999); *Mandich v. Watters,* 970 F.2d 462 (8th Cir.1992); *Leahy v. Guaranty Nat'l Ins. Co.,* 907 P.2d 697 (Colo.Ct.App.1995); *Western Indus. & Envtl. Servs., Inc. v. Kaldveer Assocs.,* 126 Idaho 541, 887 P.2d 1048 (1994); *Taylor v. Peoples Gas Light & Coke Co.,* 275 Ill.App.3d 655, 211 Ill.Dec. 942, 656 N.E.2d 134 (1995); *Brougher Agency, Inc. v. United Home Life Ins. Co.,* 622 N.E.2d 1013 (Ind.Ct.App.1993); *Aufderhar v. Data Dispatch, Inc.,* 437 N.W.2d 679 (Minn.Ct.App.1989), aff'd, 452 N.W.2d 648 (Minn.1990); *Cooper v. Yellow Freight Sys., Inc.,*

589 S.W.2d 643, 645 (Mo.Ct.App.1979); *Int'l Ass'n of Firefighters, Local 1285 v. City of Las Vegas,* 107 Nev. 906, 823 P.2d 877 (1991); *Nogue v. Estate of Santiago,* 224 N.J.Super. 383, 540 A.2d 889 (1988); *Clemens v. Apple,* 102 A.D.2d 236, 477 N.Y.S.2d 774 (1984), aff'd, 65 N.Y.2d 746, 492 N.Y.S.2d 20, 481 N.E.2d 560 (1985); *Hilowitz v. Hilowitz,* 85 A.D.2d 621, 444 N.Y.S.2d 948 (1981); *Cities Serv. Co. v. Gulf Oil Corp.,* 1999 OK 14, 980 P.2d 116; *Dunlap v. Wild,* 22 Wash.App. 583, 591 P.2d 834 (1979); *Manu–Tronics, Inc., v. Effective Mgmt. Sys., Inc.,* 163 Wis.2d 304, 471 N.W.2d 263 (Wis.Ct.App. 1991).

becomes that a court will find that the issues were "fully and fairly litigated." *Id.*

¶ 22 In contrast to the case-by-case approach, California has adopted a bright-line rule on this question. In *Vandenberg v. Superior Court*, 21 Cal.4th 815, 88 Cal. Rptr.2d 366, 982 P.2d 229, 242–43 (1999), the California Supreme Court held that a private arbitration award could not have nonmutual collateral estoppel effect unless the parties expressly provided for such preclusive effect beforehand.

¶ 23 The *Vandenberg* court recognized the benefits that derive from the inexpensive and speedy nature of arbitration for both the parties and the judicial system. *Id.* at 240. Moreover, the court considered these benefits in light of the purposes of collateral estoppel as stated above: preservation of judicial integrity, conservation of judicial resources, and protection of the parties from vexatious litigation. *Id.* In contrast to other jurisdictions, however, the court concluded that the justifications for promoting arbitration and for applying collateral estoppel did not require giving nonmutual preclusive effect to arbitration decisions. *Id.*

¶ 24 First, the court reasoned that refusing to give preclusive effect to an arbitration decision does not undermine judicial integrity because arbitration decisions are "outside the judicial system." *Id.* at 240. Second, because arbitration does not require the use of a judge or courtroom, subsequent adjudication "does not undermine judicial economy by requiring duplication of judicial resources to decide the same issue." *Id.* Third, denying nonmutual collateral estoppel effect does not protect parties from harassment by vexatious litigation. *Id.* Instead, it only prevents a third party from "gain[ing] vicarious advantage from a litigation victory won by another." *Id.* Fourth, in light of the contractual nature of arbitration, the parties to the arbitration should be the ones who determine any subsequent preclusive effect of the arbitration proceedings. *Id.* at 240–41.

¶ 25 Finally, the *Vandenberg* court found that the case-by-case approach gives insufficient consideration to the expectations of the parties and to the contractual and informal nature of arbitration. *Id.* at 241. The court

reasoned, "[u]nder the prevailing rule, parties who agree to arbitrate, but neglect or fail to negotiate a specific disclaimer of collateral estoppel effect, cannot know in advance whether a court may later find the arbitration binding in favor of third parties on different claims." *Id.* at 242. A determination of this issue would depend on whether a reviewing court finds that the arbitration proceedings offered the losing party a full and fair opportunity to litigate. Consequently, arbitration procedures would have to conform to those of traditional judicial proceedings, which would eliminate the advantages of choosing to arbitrate, including "the right to shape, control, know, and predict at the outset the scope and effect of the arbitrator's decision." *Id.*

¶ 26 Both the case-by-case and the California approaches seek to promote the use of arbitration as an alternative to traditional adjudication. However, the two approaches diverge on the critical question of whether the objectives of arbitration are best served by granting or refusing to grant collateral estoppel effect to arbitration proceedings. We concur with the California approach, and conclude that giving collateral estoppel effect to arbitration decisions will not make it a more attractive alternative forum, and consequently, will not best serve the goals of arbitration. Allowing the parties themselves to decide whether or not the arbitration proceedings will have preclusive effect in subsequent litigation against third parties better serves the goals of arbitration. Therefore, we hold that nonmutual preclusive effect will not be given to arbitration decisions unless the parties have expressly so agreed.

¶ 27 In opting for arbitration over traditional judicial proceedings, parties are selecting an inexpensive and speedier alternative. At the same time, the parties are also necessarily choosing a more informal and imprecise method for resolving their dispute. A party choosing which forum to use for dispute resolution must weigh these differences carefully. While arbitration should be encouraged, the benefits derived from its more relaxed procedures can be undermined if third parties are permitted to invoke the

theory of collateral estoppel for its results, without prior agreement by the parties.

¶ 28 In selecting arbitration, a party has demonstrated only that the current dispute is better resolved by avoiding traditional adjudication, not that it is willing to apply the arbitrator's decision to future disputes with other parties. The case-by-case approach creates uncertainty by requiring the arbitrating parties to guess whether or not arbitration will have preclusive effect in future litigation. This exposure and uncertainty make choosing to arbitrate unnecessarily risky. For example, if what is at stake in a particular dispute is small, a party might be very willing to agree to have the dispute resolved quickly through arbitration. If the party ultimately loses in arbitration, the loss would be minimal. However, if the arbitration were given preclusive effect and used offensively by a third person or group, the initial party risks losing much more than what is at stake in the original dispute. Therefore, if arbitration proceedings are routinely given nonmutual preclusive effect, the parties will be unable to predict or control what is at risk. This inability to accurately assess and control risk would chill, rather than promote, arbitration.

¶ 29 We also agree with the California court that the case-by-case approach, in its examination of how closely a particular arbitration proceeding mirrors court process, is likely to exert pressure on arbitration in general to match its process to court adjudication, thus destroying its speedy, inexpensive, and informal nature. Finally, we conclude that the case-by-case approach undermines the right of the parties to determine the scope and terms of the arbitration proceedings and their subsequent effect. Because arbitration is a matter of contract, the parties to the proceedings are entitled to determine not only the scope and questions to be resolved in the arbitration proceedings, but also whether the proceedings will have any preclusive effect with respect to third parties in future litigation. Arbitration agreements are to be enforced according to their terms, and these terms extend to a

determination of whether the findings made by the arbitrator will have any preclusive effect in subsequent litigation with other parties. Therefore, we hold that in Utah, third parties will only be permitted to invoke collateral estoppel in subsequent litigation if provided for by the parties to the original arbitration proceeding.

¶ 30 In the instant case, the deputies contend that the county should be precluded from defending itself on the issue of inequitable pay based on the outcome of the Diamant arbitration proceedings. However, because the parties involved in the Diamant proceeding made no agreement that the outcome there would have any preclusive effect in subsequent litigation, we decline to permit it. The county is therefore not precluded from defending itself against the deputies' claims of inequitable pay.

## II. BREACH OF CONTRACT

¶ 31 In considering the parties' substantive claims, we turn first to the county's contention that the trial court erred in ruling that the deputies had stated a claim for breach of contract. Any claim for breach of contract must be predicated on the existence of an express or implied contract, in this case a contract for employment. *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 32, 70 P.3d 17; *Peterson v. Delta Air Lines*, 2002 UT App 56, ¶ 10, 42 P.3d 1253. The county argues that the deputies' employment is governed by statute, and that they therefore have no employment contract.

¶ 32 In most jurisdictions, the terms of employment for public employees are set by statute. *See, e.g.,* 15A Am.Jur. *Civil Serv.* § 2 (2003); Eugene McQuillin, *The Law of Municipal Corporations* § 12.174.20 (2003). Two recent Utah cases have dealt directly with the nature of public employment, and both have held that the employment of civil servants in Utah is governed by statute, not contract. *Knight v. Salt Lake County*, 2002 UT App 100, ¶ 9, 46 P.3d 247; *Hom v. Utah Dep't of Pub. Safety*, 962 P.2d 95, 101 (Utah Ct.App.1998).[4] The deputies are statutory

4. In *Thurston v. Box Elder County,* both parties agreed that Thurston's employment was governed by the county's manual; thus the question of whether the plaintiff had an express or im-

employees; their selection, promotion, and compensation are governed by the Deputy Sheriffs' Merit System Act (the Merit Act), Utah Code Ann. §§ 17–30–1 to –24 (2001), and the County Personnel Management Act (the CPMA), Utah Code Ann. §§ 17–33–1 to –15 (2001). *See Knight*, 2002 UT App 100 at ¶ 9, 46 P.3d 247. However, there may be circumstances in which the government voluntarily undertakes an additional duty that it would otherwise have no obligation to perform, in which case an implied contract arises imposing that duty. *Id.* at ¶ 10; *Piacitelli v. S. Utah State Coll.*, 636 P.2d 1063 (Utah 1981).

¶ 33 The county argues that the CPMA, the Merit Act, and the policies implementing them do not create an employment contract. Neither trial judge, the county claims, gave any reasoning or cited any evidentiary facts supporting their holding that the deputies had stated a claim for breach of contract. The county also argues that the deputies presented no evidence beyond these statutes and policies, and that there is therefore no basis for finding that the county undertook any obligations beyond those created by statute. The deputies do not counter this argument, relying primarily on the trial court's application of collateral estoppel to the Diamant arbitration.[5] However, our holding above, declining to apply collateral estoppel to the Diamant arbitration, defeats the deputies' argument. In addition, the Diamant group did not raise claims for breach of contract in their lawsuit and the question of whether the deputies had an employment contract was never before the Diamant arbitrator.

¶ 34 This court has reviewed the CPMA, the Merit Act, and the applicable policies, and finds in them no indication that the county voluntarily undertook additional obligations beyond the statutory terms. In presenting the facts, the deputies make much of the Report issued in April 1991 by the Pay Equity Committee of the Deputy Sheriffs' Merit Commission. The Report concluded that pay disparities between otherwise equivalent employees existed and identified six factors leading to the disparities, including the method of crediting prior service. The Report also recommended measures to bring all employees of the sheriff's office to parity in pay rates. However, the Report makes no promises and does not propose any grant of back pay to those deputies who suffered pay inequities. Moreover, the Pay Equity Committee that produced the Report has no power to authorize or implement any changes. Utah Code Ann. § 17–30–5 (2001); *id.* § 17–33–5(3)(b)(xiii) (2001). Thus, the Report does not constitute an addition or amendment to the statutory employment terms of the deputies that would establish an implied contract providing back pay for a past period of pay inequity. Accordingly, we find the lower court's conclusion that the deputies stated a claim for breach of contract to be clearly erroneous and reverse.

## III. GOVERNMENTAL IMMUNITY AND THE BASIS OF THE PAY EQUITY CLAIM

¶ 35 Governmental immunity is an affirmative defense to suits against state or local government. *Trujillo v. Utah Dep't of Transp.*, 1999 UT App 227, ¶ 27, 986 P.2d 752 (citing *Nelson v. Salt Lake City*, 919 P.2d 568, 574 (Utah 1996)). Utah, like many other states, has a Governmental Immunity Act (GIA) that waives governmental immunity for certain kinds of claims against the state and its political subdivisions. Utah Code Ann. §§ 63–30–1 to –38 (2001). Further, the statute imposes procedural requirements, including notice of claim, that apply to some, but not all, of those claims for which immunity is waived. *See, e.g., Id.* §§ 63–30–5, 63–

plied employment contract that included the manual's terms was not before the court. 835 P.2d 165, 167–68 (Utah 1992). The court did find that the manual's terms could not alter or contradict an employee's statutory rights under the CPMA. *Id.*

5. The deputies also argue that their claim for back pay is a claim to a vested right, citing *Hom* for the proposition that disputes relating to a civil servant's vested rights are governed by contract rather than by statute. *Hom*, 962 P.2d at 101. This argument assumes its conclusion: that the deputies had some right under statute or contract to the back pay, thus these are vested rights governed by contract.

30–11 (2001). Compliance with the notice requirements, where applicable, is a prerequisite for subject matter jurisdiction. *Thomas v. Lewis,* 2001 UT 49, ¶ 13, 26 P.3d 217. The applicability of immunity and of the notice of claim requirements thus depends upon the nature and circumstances of a particular claim. The nature of a claim for pay equity seeking back pay as a remedy by public employees is a question of first impression for this court. We must examine the nature of the pay equity claim in order to determine whether the GIA and its notice provisions apply.

¶ 36 The trial court granted partial summary judgment to the deputies, holding that (1) the deputies had a claim for pay equity based in statute, and (2) the claim was not barred by the GIA's doctrine of discretionary functions set forth in Utah Code section 63–30–10(1). However, as discussed above, this ruling was predicated on the second judge's erroneous understanding that he was bound by the prior judge's denial of a motion to dismiss as law of the case. Here, only nineteen of the 124 plaintiffs complied with the notice requirements of the GIA. Breach of contract claims are exempted from the notice requirements, *see* Utah Code Ann. § 63–30–5, but we have now held that the deputies had no claim for breach of contract. Utah also has a well-established common law exception for equitable claims, *see Am. Tierra Corp. v. City of W. Jordan,* 840 P.2d 757 (Utah 1992); *El Rancho Enters., Inc. v. Murray City Corp.,* 565 P.2d 778 (Utah 1977), and the deputies characterize their claim as equitable because it seeks back pay. The county contends, however, that the pay equity claim is a statutory claim to which the notice requirements apply. The county also contends that the statute provides no private right of action to deputies seeking back pay, casting doubt on whether the deputies have a claim at all. We first consider the basis and nature of the pay equity claim, and then take up the GIA issues of immunity and notice.

### A. Private Cause of Action Under the CPMA

¶ 37 A private statutory right of action exists when a private party can bring a lawsuit for "relief from injuries caused by another's violation of a federal statute." Donna L. Goldstein, Note, *Implied Private Rights of Action Under Federal Statutes: Congressional Intent, Judicial Deference, or Mutual Abdication?* 50 Fordham L.Rev. 611 (1982). Many statutes do not provide a private right to sue in court. *Id.* For example, the Utah Antidiscrimination Act prohibits certain employment practices. Utah Code Ann. § 34A–5–106 (2001). However, the exclusive remedy for an employee claiming a violation of the statute is an appeal to the state Division of Antidiscrimination and Labor. *Id.* § 34A–5–107; *Sauers v. Salt Lake County,* 735 F.Supp. 381 (D.Utah 1990) (reviewing identical statutory language in a superseded version of the statute); *Gottling v. P.R. Inc.,* 2002 UT 95, ¶ 10, 61 P.3d 989. Aggrieved employees may have other causes of action that can be brought to court. *Sauers,* 735 F.Supp. at 386 (stating that intentional tort claims and certain state constitutional tort claims might not be preempted by the Act, even though claims stemming from sexual harassment were preempted). Additionally, the Division of Antidiscrimination may seek judicial enforcement of its ruling. Utah Code Ann. § 34A–5–108. But the Act itself only provides for suit by the Division of Labor Commission to enforce one of its own rulings, not for suit by a private citizen asserting a violation of the Act. *Id.* § 34A–5–107(15), –108.

¶ 38 Further, private rights of action are those that belong to the individual person or subgroup, as distinguished from those enforceable only on behalf of the general public. *Solar Salt Co. v. S. Pac. Transp. Co.,* 555 P.2d 286, 290–91 (Utah 1976) (Maughan J., dissenting). Thus, a statute requiring drivers to remove car keys and lock the vehicle can be enforced by the state, but does not establish a duty owed to a private individual who died when hit by a stolen car whose owner had violated the statute. *Rollins v. Petersen,* 813 P.2d 1156, 1164 (Utah 1991). Moreover, even if a statute expressly grants a private right of action, the scope of such right may not include all remedies. *See, e.g., Alexander v. Sandoval,* 532 U.S. 275, 287–88, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (holding that Title VI does not authorize suit by a

private citizen to enforce disparate-impact regulations, even though it authorizes the regulations themselves and authorizes private suit under other provisions).

¶ 39 The United States Supreme Court established a four-factor test for determining whether a private right of action can be inferred from a federal statute in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The Utah Court of Appeals applied the *Cort* factors in *Broadbent v. Cache County School District Board of Education*, 910 P.2d 1274, 1279 (Utah Ct.App. 1996). The court of appeals stated these factors as:

(1) whether the plaintiff is a member of a class for whose *special* benefit the statute was enacted; (2) whether [the legislature] *intended* to create or deny a private remedy; (3) whether a private remedy would be *consistent* with the Statute's underlying purposes; and (4) the extent to which the cause of action is traditionally relegated to state law.

*Id.* (citing *Griffin v. Memmott*, 814 P.2d 601, 602 (Utah Ct.App.1991) (finding no private statutory right of action under a federal statute)). As the *Broadbent* court pointed out, however, a Utah court is not bound to apply the *Cort* factors in a manner identical to a federal court. *Id.*

¶ 40 In Utah, "[i]n the absence of language expressly granting a private right of action[,] . . . the courts of this state are reluctant to imply a private right of action based on state law." *Miller v. Weaver*, 2003 UT 12, ¶ 20, 66 P.3d 592 (citing *Young v. Salt Lake City Sch. Dist.*, 2002 UT 64, ¶ 21, 52 P.3d 1230).

¶ 41 Whether a particular statute provides a private right of action is a question of statutory interpretation. *Miller*, 2003 UT 12 at ¶ 17, 66 P.3d 592. In *Miller*, we considered a statute stating that " '[n]o civil action by or on behalf of a student relating to the professional competence or performance of a certified employee of a school district . . . may be brought in court until at least 60

days after the filing of a written complaint with the board of education.' " *Id.* at ¶ 18 (quoting Utah Code Ann. § 53A–7–202(1) (1997)). We held that this language did not expressly provide a student or parent with a private cause of action against a teacher, stating that "we must require more than a mere allusion to 'civil action[s]' as evidence of a legislative intent to impart substantive rights." *Id.* at ¶ 21. To the contrary, we concluded that the whole thrust of this statute was unambiguously procedural. *Id.* at ¶¶ 18–19. Considering the statute in its entirety, we reasoned that a method for remedying statutory violations already existed in the form of an appeal to the school board and/or the State Board of Education. *Id.* at ¶ 21. We further held that it would be inconsistent with the legislature's statutory scheme to infer a private right of action for parents or students against a teacher from the statute. *Id.* at ¶ 22. The purpose of the statute was to create a state commission to hear complaints against teachers and take disciplinary action; allowing plaintiffs a cause of action under the statute would " 'override . . . a system which the Legislature has at least tacitly, if not expressly, sanctioned.' " *Id.* (quoting *Broadbent*, 910 P.2d at 1280).

¶ 42 Similarly, in *Young*, we held that an administrative regulation requiring each elementary school to prepare a routing plan for students walking to school did not create a private right of action for a student who had been struck by a car while in a crosswalk. 2002 UT 64 at ¶ 21, 52 P.3d 1230. The purpose of the regulation was to "ensure uniformity in traffic control devices and crossing guards[,] . . . not to make school districts liable." *Id.* The rule was silent on any private right of action in court. Thus, there was no evidence of legislative intent to create a private right of action for a person harmed while walking to school. *Id.*

¶ 43 Utah courts have rarely, if ever, found a Utah statute to grant an implied private right of action.[6] In *Broadbent*, for example,

6. *See Miller*, 2003 UT 12 at ¶ 20, 66 P.3d 592; *Young*, 2002 UT 64 at ¶ 21, 52 P.3d 1230; *Adkins v. Uncle Bart's Inc.*, 2000 UT 14 ¶ 32, 1 P.3d 528 (holding that the Dramshop Act's omission of

wrongful death from other causes of action established by the Act was evidence that the legislature did not intend to provide a cause for wrongful death, and a separate provision, Utah Code

the Utah Court of Appeals came to a conclusion opposite that of the Tenth Circuit in regard to exactly the same statutes. *Compare Broadbent,* 910 P.2d at 1279 *with Whitney v. Bd. of Educ.,* 292 F.3d 1280 (10th Cir.2002). Both courts addressed the question of whether the Educator Evaluation Act, Utah Code Ann. §§ 53A–10–101 to –111 (1994) and the Orderly School Termination Procedures Act, *id.* §§ 53A–8–101 to –107 (Supp.1995), provided a private right of action to an untenured teacher. *Broadbent,* 910 P.2d at 1279; *Whitney,* 292 F.3d at 1290. Applying the *Cort* factors, the Utah Court of Appeals found (1) that the Evaluation Act was intended to improve the overall quality of the educational system, educators were at most incidental beneficiaries of the acts, and there was no indication of legislative intent to modify a school's termination procedures with respect to provisional teachers; and (2) the Termination Act granted only due process rights to notice and a hearing. *Broadbent,* 910 P.2d at 1279. In contrast, the Tenth Circuit inferred from the mandatory language setting forth the due process rights that the legislature must have intended employees to have a cause of action, ignoring the other *Cort* factors. *Whitney,* 292 F.3d at 1289. The federal court also distinguished *Broadbent* because it concerned a provisional educator, not a tenured teacher. *Id.* at 1288.

■■■ ¶ 44 As indicated above, the relevant statutes here are the CPMA, Utah Code Ann. §§ 17–30–1 to –15, and the Merit Act, Utah Code Ann. §§ 17–33–1 to –24. The question before us is not simply whether employees may sue to enforce a pay equity requirement in the statutes, but whether the statutes authorize a remedy for noncompliance in the form of back pay for past periods of pay inequity. As in *Miller,* we first examine the statutes to determine whether their plain language reveals an express legislative intent to create a private right of action for employees with pay grievances.

¶ 45 Section 17–33–5(3)(b)(xiii) of the CPMA requires that county personnel rules provide for:

> preparation, maintenance, and revision of a position classification plan for all positions in the career service, based upon similarity of duties performed and responsibilities assumed, so that the same qualifications may reasonably be required for, and *the same schedule of pay may be equitably applied to, all positions in the same class,* the compensation plan, in order to maintain a high quality public work force, to take into account the responsibility and difficulty of the work, the comparative pay and benefits needed to compete in the labor market and to stay in proper alignment with other similar governmental units, and other factors.

*Id.* § 17–33–5(3)(b)(xiii) (emphasis added). The deputies argue that the pay inequities here, caused in part by the method of crediting outside law enforcement experience, violated this provision. However, the CPMA contains no express grant to employees of a cause of action based on the pay equity provision.

¶ 46 The CPMA does provide for appeals and grievances. Section 17–33–5(3)(b)(xvi) requires the personnel rules to provide for

---

section 32A–5–107(24)(h), prohibiting a dramshop from selling liquor to a person who is drunk, was an "operational restriction" that did not provide a cause of action); *J.H. v. W. Valley City,* 840 P.2d 115, 125 (Utah 1992) (holding that statutory standards for hiring police officers did not create a private right of action for a minor who was molested by a police officer, when those standards did not mandate any particular hiring procedure); *Rollins v. Petersen,* 813 P.2d 1156, 1164 (Utah 1991); *Milliner v. Elmer Fox & Co.,* 529 P.2d 806, 808 (Utah 1974) (holding that the Utah Uniform Securities Act making certain practices unlawful did not provide a cause of action for a party injured by those practices); *Youren v. Tintic Sch. Dist.,* 2004 UT App 33, 86 P.3d 771 (holding anti-nepotism statutes do not

create a private right of action); *Snow Flower Homeowners Assoc. v. Snow Flower, Ltd.,* 2001 UT App 207, ¶ 24, 31 P.3d 576 (holding that Utah Code section 57–8–35(2), which prohibits building of condominium projects not complying with applicable building codes, does not provide a private right of action to condominium owners to sue for defects in a building not meeting the codes); *Broadbent,* 910 P.2d at 1279; *Richards Irrigation Co. v. Karren,* 880 P.2d 6 (Utah Ct.App. 1994); *Nielson v. Div. of Peace Officer Standards & Training (POST),* 851 P.2d 1201, 1204 (Utah Ct.App.1993) (holding that administrative rule does not give the public substantive rights in the disciplinary process for police officers); *Griffin,* 814 P.2d at 602.

"establishment of a plan for resolving employee grievances and complaints with final and binding decisions." *Id.* § 17–33–5(b)(6)(xvi). Sections 17–33–5(3)(b)(xv) and (xvii) require establishment of plans governing layoffs and of disciplinary measures, respectively. Section 17–33–10, titled "Grievance and appeals procedure," states:

(1) Any county to which the provisions of this act apply shall establish in its personnel rules and regulations a grievance and appeals procedure. The procedure shall be used to resolve disputes arising from grievances as defined in the rules and regulations, including but not limited to acts of discrimination.

. . . .

(2) Any charge by a county career service employee of discriminatory or unfair employment practice as prohibited by Section 34A–5–106, can be filed with the Division of Antidiscrimination. . . .

*Id.* § 17–33–10. The CPMA also establishes a career service council that "shall hear appeals . . . and other grievances not resolved by the grievance procedure at the division or departmental level," *id.* 17–33–4(1)(b), with judicial review of the council decisions in district court, such review limited to the record and employing an arbitrary and capricious standard of review, *id.* § 17–33–4(1)(d). Section 17–33–4.5 further provides the career service council with the option to refer appeals to an administrative law judge. *Id.* § 17–33–4.5.

¶ 47 Nothing in these provisions can be read as either an express or implied grant of a right of action to employees who have a grievance for pay equity. Instead, the legislature has provided for an appeals procedure to a career service council, with judicial review limited to the record of such appeal. The legislature directs charges of discrimination or prohibited employment practices under section 34A–5–106 to the Division of Antidiscrimination, a method of resolution that, as we noted earlier, does not provide the employee with a judicial cause of action. *Id.* § 17–3–10.

¶ 48 Moreover, there is no express grant to county employees of a remedy of back pay for pay inconsistent with section 17–33–

5(3)(b)(xiii). Federal statutes explicitly include back pay as a remedy for violations of Title VII, 42 U.S.C. § 2000e–5(g) (2000), and of the Back Pay Act, 5 U.S.C. § 5596(b)(1) (2000). Utah's antidiscrimination statute also provides for back pay as a remedy that the Labor Division may require. Utah Code Ann. § 34A–5–107(9)(b) (2001). But the CPMA contains no such provisions. The legislature's silence cannot be interpreted as revealing an intent that employees have a right to seek back pay as a remedy for a claim to pay equity under the CPMA.

¶ 49 In *Miller,* this court stated that the "reluctance [to imply a private right of action] is particularly strong when the Legislature has already designated a method of resolution through an administrative agency specifically empowered to handle issues such as the discipline or termination of teachers and police officers." 2003 UT 12 at ¶ 20, 66 P.3d 592. Here, although the statutory language requiring equitable pay for the deputies is mandatory, there is no express provision for employees to sue seeking a private remedy such as back pay. Further, the legislature did explicitly include an appeals procedure to resolve "disputes arising from grievances . . . not limited to acts of discrimination." Utah Code Ann. § 17–33–10 (2001). As evidenced by sections 17–33–4, –4.5 and –10, the legislature created a statutory scheme for handling all grievances and appeals of county employees. The only provision for recourse to a court is a suit for judicial review of a career service council decision. The existence of this provision reveals a legislative intent to limit employees to this course of action. Thus, the CPMA contains no evidence of legislative intent to provide employees with a cause of action for back pay to remedy past pay equity, or for any other grievances stemming from county personnel rules and policies.

¶ 50 Further, it would be inconsistent with the legislature's statutory scheme to infer a private right of action for employees with pay grievances based on section 17–33–5(3)(b)(xiii). The CPMA recites Merit Principles which include "provision of a formal procedure for processing the appeals and grievances of employees without discrimina-

tion, coercion, restraint or reprisal." *Id.* § 17–33–3(7). The provisions for appeals to the career service council, with judicial review limited to the record, and specifying that charges for discrimination are to be taken to the Division of Antidiscrimination, clearly make up a comprehensive scheme for dealing with employee grievances, including pay grievances. As in *Miller,* it would be inappropriate for this court to interfere with the legislature's scheme by inferring a private right of action from the pay equity provision.

¶ 51 Moreover, the explicit purpose of the pay equity and other pay plan elements is "to maintain a high quality public workforce." *Id.* § 17–33–5(3)(b)(xiii). This language contradicts the notion that this provision was enacted for the special benefit of county employees (the first *Cort* factor). By its own terms, the provision was enacted for the benefit of the public, not to benefit a class of county employees.

¶ 52 Further, there is no "clear and substantial" public policy whose contravention by pay inequity for deputies would justify inferring a private statutory cause of action. *See, e.g., Fox v. MCI Communications Corp.,* 931 P.2d 857, 860 (Utah 1997) (citing *Berube v. Fashion Ctr., Ltd.,* 771 P.2d 1033, 1042 (Utah 1989) and *Retherford v. AT & T Communications,* 844 P.2d 949, 966 n. 9 (Utah 1992)). The deputies' claim of pay inequity does not implicate either fundamental rights or a protected class. Thus, there is no weighty rationale to overcome this court's normal reluctance to imply a cause of action from a statute. Even where there is a strong public policy, as in discrimination, the legislative body retains the right to specify the remedies and course of action available for violations of a statute it has enacted to pursue such policy. In both the federal antidiscrimination laws of Title VII and the Utah Antidiscrimination Act, the respective legislative bodies created statutory prohibitions against certain employer conduct while simultaneously specifying and limiting the victim's remedies and causes of action. Title VII grants a cause of action, but requires the employee claimant first to file with the Equal Employment Opportunity Commission; the employee can sue in court only if the EEOC releases the claim. 42 U.S.C. § 2000e–5(f) (2000); *see generally* Jerald J. Director, *Time Requirements for Civil Action for Violation of Equal Employment Opportunities Provisions Under § 706 of the Civil Rights Act of 1964,* 4 A.L.R. Fed. 833, 837–39; Supp. 144–146 (1968 & Supp.2001). The Utah Antidiscrimination Act similarly prohibits a number of forms of employment discrimination, but limits a victim's recourse by providing that the "exclusive remedy under state law for employment discrimination" is the administrative procedure set forth in the Act. Utah Code Ann. § 34A–5–107(15). Moreover, despite the clear and strong public policy against employment discrimination, this court has read the "exclusive remedy" phrase literally to find that even though the Antidiscrimination Act applies only to "employers" with fifteen or more employees, it prohibits an employee of a business with fewer employees from bringing a common law action. *Gottling v. P.R. Inc.,* 2002 UT 95, ¶¶ 12–13, 20, 61 P.3d 989 (citing *Burton v. Exam Ctr. Indus. & Gen. Med.,* 2000 UT 18, ¶ 21, 994 P.2d 1261). Here, the deputies' pay equity claim involves no such compelling public policy, and we conclude there is no implied private right to bring such a claim under the CPMA.

¶ 53 The Merit Act also supplies no evidence that the legislature intended employees to have a cause of action for pay grievances. It provides procedures for examining candidates and hiring and disciplining of deputy sheriffs, and it also establishes the Deputy Sheriffs' Merit System Commission with the power to "formulate a comprehensive job classification plan covering all peace officers of the governmental unit." Utah Code Ann. § 17–30–5. The Merit Act and the CPMA are intended to work together: "This chapter recognizes the existence of the merit systems for peace officers ... as provided for in Chapter 30." *Id.* § 17–33–1(3). However, the Commission is only authorized to hear appeals by applicants regarding the examination. *Id.* § 17–30–7. This court has previously held that under comparable statutory language in Utah Code section 10–3–1012, a municipal Civil Service Commission lacked jurisdiction to hear a claim of pay equity.

*Harmon v. Ogden City Civil Serv. Comm'n,* 917 P.2d 1082, 1084–85 (Utah 1996).

¶ 54 For the foregoing reasons we hold that neither the CPMA nor the Merit Act create a private statutory right of action for employees to sue for pay equity with back pay as a remedy.

### B. Back Pay as an Equitable Claim

¶ 55 Although the deputies do not have a private statutory right of action for back pay to remedy past pay inequity in violation of the CPMA, the question remains whether they may, as they contend, claim back pay as compensation for past pay inequity in violation of a state civil service statute under this court's equitable jurisdiction. This is a novel question in Utah law, and also, it appears, in most other jurisdictions. If the deputies were employees in the private sector, any claim for back pay would necessarily be based on contract, wrongful termination, or unlawful discrimination, none of which is claimed here. Moreover, they are public employees, and the CPMA and the Merit Act require county administrators to create pay plans that ensure pay equity.

¶ 56 Generally, equitable jurisdiction is limited to cases in which either the remedy sought is an equitable remedy (injunction, mandamus, specific performance, contract reformation, job hiring or reinstatement), or because the plaintiff has no other remedy at law and the moral substance of the claim is so compelling that it requires a judicial remedy. Dan B. Dobbs, *Law of Remedies,* (2d ed. 1993); 27A Am.Jur.2d *Equity* §§ 39–45 (2000). Also, a suit in equity may be proper to enforce compliance with a statutory obligation. *Id.* § 51 (citing *Reebok Int'l v. Marnatech Enters.,* 970 F.2d 552 (9th Cir.1992) (holding that the district court properly exercised equitable jurisdiction to grant an injunction and freeze assets to enforce the Lanham Act)). An equitable remedy may also be proper if fraud, duress, unconsciona-

ble hardship, or pecuniary results shocking to the conscience are involved. *Marchant v. Nat'l Reserve Co.,* 103 Utah 530, 137 P.2d 331 (1943); *see also* 27A Am.Jur.2d *Equity* §§ 48, 49 (2003). However, the general rule is that equitable jurisdiction is precluded if the plaintiff has an adequate remedy at law and will not suffer substantial irreparable injury. *Id.* §§ 30, 45. Equitable jurisdiction is not justifiable simply because a party's remedy at law failed. *Id.* § 48.

▆▆▆ ¶ 57 This court has "traditionally ... limited the application of equity to cases of fraud, misrepresentation, duress, undue influence, mistake, and waiver." *Utah Coal & Lumber Rest., Inc. v. Outdoor Endeavors Unlimited,* 2001 UT 100, ¶ 13, 40 P.3d 581 (citations omitted). The deputies contend that the county represented to them that the Diamant arbitration would apply to them, but the record evidence they cite is extremely limited and certainly insufficient to support fraud.[7] The CPMA provides the deputies with a remedy at law: a grievance process with judicial review. The deputies have not argued that their injury is substantial and irreparable, that it is unconscionable, or that duress is involved. Moreover, as the county concedes, employees who are being paid inequitably normally have a remedy in an equitable cause of action seeking to compel a county to comply with the pay equity provision. *See, e.g., Green v. Turner,* 2000 UT 54, 4 P.3d 789; *Glendale City Employees' Ass'n, Inc. v. City of Glendale,* 15 Cal.3d 328, 124 Cal.Rptr. 513, 540 P.2d 609 (1975). Here, however, the pay plan was changed before these deputies brought suit, and they are seeking back pay to compensate for past pay inequity. Back pay is ordinarily considered a legal remedy comparable to money damages, rather than an equitable remedy. *Hubbard v. EPA,* 982 F.2d 531, 533 (D.C.Cir. 1992) (en banc) (holding that the Administrative Procedures Act did not waive sovereign immunity for a claim of money damages as

---

7. The evidence cited consists of (1) the bare assertion, without reference to dates or places, in the deputies' Answer to First Set of Interrogatories, that such representations were made; and (2) the deposition of a county council member,

stating "what would be good for [the Diamant group] would be good for the others" and "however ... [the Diamant case] was to be resolved ... all people in the class should have the same outcome benefited [sic] to them."

compensation for a failure to hire that violated the plaintiff's civil rights); *see also* Colleen P. Murphy, *Misclassifying Monetary Restitution* 55 SMU L.Rev. 1577, 1628–35 (2002).[8]

¶ 58 The deputies argue that back pay is equitable relief. However, all the employment law cases they cite are based upon statutory violations of Title VII. These cases are inapposite for two reasons. First, Title VII explicitly provides back pay as a remedy, whereas Utah's statutes do not. *Compare* 42 U.S.C. § 2000e–5(g) (2000). Second, the violations of Title VII that justify the back pay remedy are limited to acts of racial or other discrimination, reflecting a public policy goal to end discrimination and make its victims whole. Such considerations do not exist here. For these reasons, we decline to treat the deputies' claim for pay equity as an equitable claim. Because we hold that the deputies have no breach of contract claim and that they have neither a private statutory right of action under the CPMA or the Merit Act, nor an equitable claim for back pay, we do not reach the issues of governmental immunity, notice, the county's compliance with the pay provision, the statute of limitations, or attorney's fees.[9]

## CONCLUSION

¶ 59 We hold that collateral estoppel effect will not be given to an arbitration decision where the parties have not so agreed beforehand. Additionally, we reverse the trial court's grant of summary judgment to the deputies on the issues of breach of contract and pay equity and, in light of the rulings herein, direct entry of judgment in favor of the county.

8. Back pay is also often said to be restitutionary in nature, but as a legal term of art "restitution" has traditionally been concerned with the profits of a defendant, not restoration of a loss to a plaintiff. Murphy, *supra*, at 1597.

9. The trial court relied on the law of the case doctrine in declining to review an earlier ruling on the county's motion to dismiss in this case. This issue was raised and argued in the briefs, but is not dispositive in this case. We note that a

¶ 60 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.

trial judge may and, in the event of changed circumstances (such as the emergence of new evidence), perhaps should reconsider the ruling of an earlier judge in the same case, just as a judge could reconsider his or her own previous rulings. *See Red Flame v. Martinez*, 2000 UT 22, ¶¶ 4–5, 996 P.2d 540. When a question of law is involved, however, parties should not incorrectly conclude that it is "open season" on earlier rulings.