258 P.3d 598 (2011)
2011 UT App 171
EDUCATORS MUTUAL INSURANCE ASSOCIATION, Plaintiff and Appellee,
v.
Joel EVANS, Defendant, Third-party Plaintiff, and Appellant,
v.
Salt Lake City Corporation, Third-party Defendant and Appellee.
No. 20090527-CA.
Court of Appeals of Utah.
June 3, 2011.
*601 Brian S. King, Salt Lake City, for Appellant.
Curtis J. Drake and Troy L. Booher, Salt Lake City, for Appellee Educators Mutual Insurance Association.
J. Wesley Robinson, Salt Lake City, for Appellee Salt Lake City Corporation.
Before Judges ORME, VOROS, and ROTH.

OPINION
VOROS, Judge:
¶ 1 Joel Evans is a military veteran and a Salt Lake City police officer. After being injured as a police officer, Evans applied for disability benefits from Salt Lake City Corporation (the City). The City administered its disability benefits through Educators Mutual Insurance Association (Educators). Various disputes arose concerning the amount and duration of these benefits and whether they should be offset by federal benefits Evans was receiving. The trial court granted summary judgment against Evans, who appeals. We affirm in part and reverse in part.

BACKGROUND
¶ 2 Evans is a peacetime and Gulf War era veteran. He served in the Army from May 25, 1981, to August 28, 1981, and in the first Gulf War from November 21, 1990, to May 30, 1991. He began receiving disability benefits from the Department of Veterans Affairs (VA benefits) in June 1999. These benefits were based on multiple service-related health problems.
¶ 3 Upon returning from the Gulf War, Evans resumed his duties as a Salt Lake City police officer until he became further disabled in 2001. In October 2001, Evans applied for disability benefits under the City's disability program, which was administered by Educators. When he applied for disability benefits from Educators, he listed multiple disabling conditions, including some that overlapped with those for which he was receiving VA benefits.
¶ 4 Educators awarded Evans disability benefits, but with several limitations. First, Evans was awarded a monthly disability benefit of two-thirds of his regular base monthly income, rather than 100%. The Group Long-Term Disability Plan (the Plan) allowed a benefit of 100% of a person's salary only if the person was disabled from injuries occurring on the job. Educators determined that at least some of Evans's injuries stemmed from his service in the Gulf War, rather than his service as a Salt Lake City police officer. Second, Evans was awarded disability benefits for only twenty-four months. The Plan allowed benefits up to twenty-four months "[i]f a covered employee is disabled from performing the duties of the occupation he performed before disability." It allowed benefits for a longer period only "[i]f a covered employee is disabled from performing any and all occupations." Educators determined that Evans, though disabled from his regular occupation, was not disabled from "any and all occupations." Educators did, however, state that after twenty-four months Evans could request that benefits be extended if he was at that time totally disabled from "any and all occupations." Third, Evans was required to participate in a vocational rehabilitation program. Fourth, Evans's monthly benefit was to be offset by any amount he might receive in VA benefits. Educators informed Evans that "[acceptance of the benefit indicates acceptance of the diagnosis" and that if he disagreed with any of the decisions made on his claim, he must write to Educators within thirty days.
*602 ¶ 5 Evans's then-counsel timely wrote to Educators, challenging some of the decisions made on his claim. His letter outlined three objections: (1) he asserted that Evans's disability benefit should not be limited to two-thirds of his salary; (2) he asserted that Evans's disability benefit should not be offset by the VA benefits; and (3) he asserted that negotiating the benefit checks should not be deemed acceptance of the limited benefit. This letter said nothing about the twenty-four-month time limit.
¶ 6 Educators' counsel responded, stating that he had reviewed Evans's concerns and had obtained an independent medical opinion from a physician with expertise in disability issues. Educators maintained its position, first, that it was entitled to offset Evans's award by his VA benefits, and second, that Evans was not entitled to 100% of his salary because his "current disability is not caused by on-duty injuries, either individually or in total." This letter stated that if Evans wished to appeal the decision to Educators' Claims Review Committee, he should "kindly notify [Educators' counsel] within sixty days of the date of this letter."
¶ 7 Shortly thereafter, Educators sent Evans a second letter indicating that it had received information from the Department of Veterans Affairs that Evans was currently receiving disability benefits. Educators asserted that Evans had therefore received an overpayment from Educators because his benefits were supposed to have been offset by his VA benefits. Educators requested that Evans repay Educators the amount of the overpayment, which it stated was $11,568.40.
¶ 8 Evans timely requested review of "the entire decision of Educators denying Evans's claims," as outlined in his previous letter. Educators' Claims Review Committee rejected Evans's appeal. It affirmed that his disability payments would be offset by his VA benefits. And it concluded that his disability benefits would be paid at two-thirds of his salary because his disability was "a combination of many things," including injuries incurred prior to his police service, injuries secondary to his police service, and conditions unrelated to his police service. The letter also informed Evans that he had the right to appeal to Educators' Board of Directors (the Board) and that any such appeal must be made in writing within thirty days.
¶ 9 Fifty-eight days later, Evans's then-counsel wrote a letter requesting an appeal to the Board. The Board denied his appeal as untimely. Counsel then wrote a letter to Educators accepting responsibility for missing the deadline and stating that he had miscalculated the due date. Counsel asked Educators to waive the deadline and allow Evans to proceed with his appeal. Educators denied this request.
¶ 10 Some months later, Educators notified Evans that his disability benefits were about to expire because the twenty-four months had passed. Evans, through new counsel, requested an extension of benefits on the ground that his physical condition rendered him permanently "incapable of engaging in any occupation or employment for wage or profit." Educators agreed to review the file and stated that its review would take approximately thirty days. In addition, Educators directed that "[d]uring this time Mr. Evans will need to request all new current medical information from all doctors that are treating him for his disability at this time and who can substantiate that he is totally disabled from any and all occupations."
¶ 11 Evans responded by submitting two one-page documents. First, he submitted a one-page report from his treating physician indicating that Evans could not work at his regular work, nor could he work eight hours per day. Evans also submitted a one-page letter from himself, stating "I remain totally disabled and remain eligible for [benefits]." Both submissions were made within thirty days of Educators' letter. Evans submitted no other information at this time.
¶ 12 Many months later, Educators sued Evans, alleging breach of contract and seeking $8,510.78 in overpayments.[1] Evans counterclaimed against Educators and filed a third-party complaint against the City. He *603 alleged that the City and its agent, Educators, had breached the contract and violated Utah law by awarding him disability payments of only two-thirds of his salary, by offsetting his disability benefits by his VA benefits, and by terminating his benefits after twenty-four months. Shortly thereafter, Evans sent Educators another letter from his doctor indicating that Evans was disabled from all occupations.
¶ 13 A year passed filled with pleadings and discovery. At a hearing on the parties' cross-motions for partial summary judgment, the trial court noted that Educators had yet to determine whether Evans was entitled to permanent disability benefits. Shortly after the hearing, Educators sent Evans a letter denying permanent disability benefits on the ground that he had not provided the required medical documents, but giving him sixty days to appeal the decision to the Claims Review Committee.
¶ 14 The trial court ruled on the parties' cross-motions for partial summary judgment on April 6, 2006. First, it addressed the issue of whether Evans was entitled to receive benefits equivalent to 100% of his salary, rather than two-thirds of his salary. It granted summary judgment in favor of Educators on the ground that Evans had not complied with the contractual requirements setting forth the deadlines for appeal. Second, the trial court addressed the question of Educators' denial of disability benefits beyond the twenty-four-month limit. It denied Educators summary judgment on the ground that Educators had not yet informed Evans of its decision.[2] Third, the trial court addressed the question of whether Educators could offset Evans's disability benefits by his VA benefits. It denied summary judgment to Evans on the ground that an issue of material fact existed. Fourth, the trial court addressed the question of whether Evans was disabled in January 2002 as a result of injuries sustained in the line of duty and whether Evans was totally and completely disabled from "any and all occupations." The trial court denied Evans summary judgment on the ground that issues of material fact existed.
¶ 15 Weeks after this order was issuedbut within sixty days of Educators' letter denying Evans permanent disability benefitsEvans submitted a lengthy letter from his counsel describing Evans's medical problems and asserting that Educators had failed to provide Evans with the information he needed to successfully request benefits. Educators again denied Evans's claim, citing a lack of medical evidence. It also told him he could submit to binding arbitration if he wished to contest the decision. Following this denial, Educators renewed its motion for summary judgment on the question of whether Evans was entitled to benefits beyond the twenty-four months, this time asserting that the appeals process was complete. The trial court granted this motion, agreeing with Educators that Evans "did not provide supporting documentation in a timely manner in connection with his appeal as required by the terms of the [Plan]."
¶ 16 The parties then turned to the question of whether Educators could offset Evans's disability benefits by the amount he received as VA benefitsand the converse question of whether Educators was entitled to a reimbursement of the $8,510.78 that it alleged was an overpayment. The trial court entered summary judgment in favor of Educators on the ground that the pre-2002 version of Utah Code section 49-9-402, in effect at the time of Evans's injury, authorized Educators to offset Evans's VA benefits. See Utah Code Ann. § 49-9-402 (1998).
¶ 17 Meanwhile, the City, seeking to extricate itself from the litigation, moved for summary judgment on the ground that Evans had failed to arbitrate his claim and therefore had violated the terms of the Plan. Evans responded that the arbitration clause was unenforceable against him. The trial court concluded that the arbitration clause was enforceable and granted the City's motion for summary judgment. The trial court dismissed Evans's claims against the City with prejudice.

*604 ISSUES AND STANDARDS OF REVIEW
¶ 18 Evans raises four issues on appeal. First, he contends that the trial court erred in ruling that his VA benefits were "armed services . . . disability benefits" within the meaning of Utah Code Ann. § 49-9-402(2)(c) (1998). "[A] matter of statutory interpretation is a question of law that we review on appeal for correctness." Archuleta v. St. Mark's Hosp., 2009 UT 36, ¶ 5, 238 P.3d 1044 (internal quotation marks omitted).
¶ 19 Second, Evans contends that the trial court erred in upholding Educators' denial of his eligibility for long-term disability benefits beyond twenty-four months. This issue requires the interpretation of a contract, which is a question of law that we review for correctness. See Pack v. Case, 2001 UT App 232, ¶ 16, 30 P.3d 436.
¶ 20 Third, Evans contends that the trial court erred in upholding Educators' enforcement of its thirty-day administrative appeal deadline on the issue of whether his disabling conditions were a result of injuries sustained on the job. "Interpretation of the terms of a contract is a question of law," which we review for correctness. Id.
¶ 21 Finally, Evans contends that the trial court erred in ruling that the City was entitled to enforce the Plan's arbitration clause. "[D]etermining whether a contractual right of arbitration has been waived presents mixed questions of law and fact." ASC Utah, Inc. v. Wolf ML Resorts, LC, 2010 UT 65, 111, 245 P.3d 184 (internal quotation marks omitted). "[W]hether the [district] court employed the proper standard of waiver presents a legal question which is reviewed for correctness, but the actions or events allegedly supporting waiver are factual in nature and should be reviewed as factual determinations, to which we give a district court deference." Cedar Surgery Ctr., LLC v. Bonelli, 2004 UT 58, ¶ 6, 96 P.3d 911 (alterations in original) (internal quotation marks omitted).

ANALYSIS

I. Offsetting Evans's Benefits
¶ 22 The Public Employees' Long-Term Disability Act (the Act) governs the administration of long-term disability benefits to certain public employees. The Act is currently found at Utah Code Ann. §§ 49-21-101 to -406 (2010).[3] The parties agree that under the Act, the City may adopt its own disability plan, as long as that plan is substantially similar to the Act. See id. § 49-15-601; id. § 49-21-201(2); id. § 49-21-201(6) (2002); id. § 49-9-102 (1998). Accordingly, Evans is covered by the Plan, not the Act, but only so long as the Plan is substantially similar to the Act. Presumably in response to this requirement, the Plan contains a provision, discussed below, designed to ensure that the terms of the Plan conform to the minimum requirements of the Act.
¶ 23 Evans applied for disability benefits in 2001. The 2001 version of the Act reduced a beneficiary's monthly disability benefit by the amount of disability benefits received from several enumerated sources. These included "armed services retirement or disability programs":
The monthly disability income benefit shall be reduced by any amount received by, or due to, the employee from the following sources for the same period of time during which the employee is entitled to receive the monthly disability benefit:
(a) Social Security, including all benefits received by the employee, the employee's spouse, and the employee's dependent children . . .;
(b) workers' compensation;
(c) armed services retirement or disability programs;
(d) civil service retirement or disability programs;
(e) disability benefits under any group insurance plan providing disability income benefits for which contributions or *605 payroll deductions are made by the employer;
(f) any employer-paid public or private retirement or disability program for which the employee is eligible;
(g) any monies received by judgment, legal action, or settlement from a third party liable to the employee for the disability; and
(h) unemployment compensation benefits.
Id. § 49-9-402 (1998) (emphasis added).
¶ 24 The Plan contained a parallel provision. It stated that disability payments would "be reduced dollar for dollar by income received from any of [several enumerated] sources." These included "[a]rmed [s]ervices retirement or disability programs."
¶ 25 In 2002, while Evans was receiving disability benefits under the Plan, the Act was amended (the 2002 amendment). The 2002 amendment modified the list of potential offsets and added a catch-all category:
(a) Social Security disability benefits, including all benefits received by the eligible employee, the eligible employee's spouse, and the eligible employee's dependent children;
(b) workers' compensation indemnity benefits;
(c) any monies received by judgment, legal action, or settlement from a third party liable to the employee for the disability;
(d) unemployment compensation benefits;
(e) automobile no-fault, medical payments, or similar insurance payments; and
(f) any other disability benefits resulting from the disability for which benefits are being received under this chapter.
Id. § 49-21-402 (2002) (emphasis added). Educators made no modifications to Evans's benefits following this amendment.
¶ 26 The trial court determined that (1) "Evans received disability benefits from the Department of Veterans Affairs which is an `armed services retirement or disability program,' within the meaning of the 2001 version of [the Plan] and [the Act]"; (2) "[b]enefits from an `armed services retirement or disability program' may be set off against disability benefits paid pursuant to the Plan or the Act"; (3) "[t]he Plan is consistent with [the] Act with respect to Utah Code Ann. § 49-9-402 (2001)"; (4) Educators and Evans are "bound by the terms of the 2001 versions of the Plan and the Act"; and (5) "[n]either the Plan nor the Act requires that, in order to offset benefits under the Plan or the Act, the disabilities for which the covered person is receiving disability benefits from an `armed services retirement or disability program' are the same disabilities for which the covered person is receiving disability benefits under the Plan or the Act." This last conclusion was based on the trial court's determination that the 2002 amendments to the Act were intended to clarify, not modify, the 2001 statute. The trial court concluded that "the language of the [2001 and 2002 versions of the Act] is consistent."
¶ 27 On appeal, Evans contends that Educators should not have offset his VA benefits for two reasons. First, he asserts that his VA benefits do not fall under the umbrella of "armed services retirement or disability benefits" as that term is used in the 2001 version of the Plan or the Act. Second, he asserts that even if Educators could originally offset his disability benefits by his VA benefits, it no longer could after the 2002 amendment excised the "armed services" language from the Act. We consider each argument in turn.[4]

*606 A. The Effect of the 2001 Statute
¶ 28 Evans contends that his VA benefits are not paid by "armed services retirement or disability programs." He argues that "armed services" refers to "individuals while they are actively serving rather than after their discharge from the military." Evans demonstrates that benefits administered by the Department of Defense and benefits administered by the Department of Veterans Affairs are treated separately in the United States Code. Compare 10 U.S.C. § 1203 (2006), with 38 U.S.C. § 1110 (2006). He also cites various cases that explain that the administration of veterans benefits is different than the administration of benefits paid by the active branches of the military. See Hinkle v. United States, 229 Ct.Cl. 801, 1982 WL 26543 (1982) ("[Neither] the court [n]or the Air Force [are] bound by [a] decision of the Veterans Administration which operates under different laws and standards and for different purposes than the military when it comes to deciding disability entitlements."); Lockwood v. United States, 90 Fed.Cl. 210, 219 (2008) ("[A]lthough a VA rating decision may be relevant to consideration of an appropriate disability rating, it is not binding on the service branch."). These cases illustrate that the Department of Defense and the Department of Veterans Affairs separately determine and pay benefits to current and former service members. We do not disagree with Evans on this point. We recognize that these are distinct departments of the federal government, that they are treated separately in the United States Code, and that they differ markedly in other significant ways.
¶ 29 However, the question is not whether a distinction exists, but whether the 2001 version of the Act, and thus the drafters of the Plan, intended to rely on this distinction. To answer this question, we must interpret both the 2001 version of the Act and the 2001 version of the Plan. Our principles of statutory construction and contract interpretation are similar and well-established:
When faced with a question of statutory interpretation, our primary goal is to [determine] the true intent and purpose of the Legislature. We do so by looking at the best evidence of legislative intent, namely, the plain language of the statute itself. As part of this well-worn canon[] of statutory construction, we must read the plain language of the statute as a whole. Under this whole statute interpretation, we construe provisions in harmony with other provisions in the same statute and with other statutes under the same and related chapters. We do so because [a] statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole.
Archuleta v. St. Mark's Hosp., 2009 UT 36, ¶ 8, 238 P.3d 1044 (alterations in original) (citations and internal quotation marks omitted). We take a similar approach when interpreting contracts:
Well-accepted rules of contract interpretation require that we examine the language of a contract to determine meaning and intent. Where the language is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law. We will also consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none. The court considers extrinsic evidence of the parties' intent only if the language of the contract is ambiguous. A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies. When determining whether the plain language is ambiguous, we attempt to harmonize all of the contract's provisions and all of its terms.
Glenn v. Reese, 2009 UT 80, ¶ 10, 225 P.3d 185 (omission in original) (citations and internal quotation marks omitted).
¶ 30 Here, Evans urges us to limit the formulation "armed services retirement or disability programs" to those programs administered *607 by the Department of Defense, excluding those administered by the Department of Veterans Affairs. To do so, we would have to conclude that the Legislature intendedbut did not explicitly statethat VA benefits would be a carved-out exception to the term "armed services." This position is untenable for several reasons.
¶ 31 First, nothing suggests that the drafters of the Act or the Plan intended to use "armed services retirement or disability programs" as a term of art to differentiate benefits administered by the Department of Defense, which would be included in the list, from benefits administered by the Department of Veterans Affairs, which would be excluded. Indeed, "armed services" is not a term of art. Evans does not make this claim, and in fact neither of the cases he cites even uses the term "armed services." See Hinkle, 229 Ct.Cl. 801; Lockwood, 90 Fed.Cl. 210. Nor does our own research suggest that "armed forces disability programs" or "armed services benefits" are terms of art, even in the federal system.
¶ 32 In addition, Evans offers no plausible explanationand none occurs to uswhy those designing state or local disability programs would allow an offset for disability payments from the Department of Defense but not for disability payments from the Department of Veterans Affairs. Moreover, the narrow reading of "armed services retirement or disability programs" that Evans urges is out of harmony with the statute as a whole. It names a wide variety of benefits that should be offset from state or local disability payments. These include social security benefits, including benefits received by family members; workers' compensation benefits; civil service retirement or disability benefits; disability benefits under employer-based group insurance plans; employer-paid public or private retirement or disability programs; and unemployment compensation benefits. See Utah Code Ann. § 49-9-402 (1998). And the Plan allows the offset of even more income sources: "[a]ny retirement income received from a plan to which the City made contributions," and "[a]ny other group salary indemnity plan." We see no reason why drafters of the Act or the Plan would cast a net wide enough to sweep in this array of benefits and yet exclude similar benefits paid by the Department of Veterans Affairs.
¶ 33 In sum, we read the plain language of "armed services retirement or disability programs" to include VA retirement and disability benefits. Thus, at least prior to the amendment of the Act and the Plan in 2002, we agree with the trial court that Educators properly offset Evans's VA benefits against his benefits paid under the Plan.

B. The Effect of the 2002 Amendment
¶ 34 Evans next contends that even if Educators was allowed to offset his benefits by his VA benefits in 2001, this was no longer true after the Act and the Plan were amended in 2002. Educators responds that the meaning of the Plan is fixed at the time of the injury and that the 2002 amendments are therefore irrelevant to this appeal. Educators relies on Shepherd v. Diversa-Cycle Products, Inc., 725 P.2d 1317 (Utah 1986), for the proposition that "[t]he law in effect at the time of [the] injury governs th[e] case." Id. at 1318. This argument presupposes, however, that Evans's claim is based on the Act. As explained above, this dispute is governed by the terms of the Plan.
¶ 35 The Plan has several relevant provisions. First, the Plan states that its initial effective date was July 1, 2001. But it also includes an "evergreen provision," providing that it is "automatically renewed on its anniversary date for a period of one year, unless otherwise terminated by the City." Second, the Plan states that "[a]ny provision of this Plan that, on the effective date, conflicts with any applicable statute, is amended to conform to the minimum requirements of such statutes." (Emphasis added.) Thus, the Plan is a continually evolving document, adapting to statutory amendments as they occur. Third, the Plan states that "[b]enefits are payable under Sections 49-9-40[1[5]] and *608 49-9-402 of the Utah Code Annotated." Finally, the Plan states that "[a]mendments will not apply to claims arising prior to the amendment's effective date."
¶ 36 On July 1, 2001, the Plan was tied to the 2001 version of the Act. It thus allowed for the offset of disability benefits from "[a]rmed [s]ervices retirement or disability programs." The following year, however, the relevant section of the Act had been amended. See Utah Code Ann. § 49-21-402 amend, notes (2002). The new language provided not for the offset of "armed services" benefits, but for the offset of any "disability benefits resulting from the disability for which benefits are being received under this chapter." Id. § 49-21-402(2)(f). The Plan's plain language, however, still allowed for the offset of disability benefits from "[a]rmed [s]ervices retirement or disability programs." Because the Plan's language remained the same, but the statute changed, the Plan's conflict provision was triggered: "Any provision of this Plan that, on the effective date, conflicts with any applicable state statutes, is amended to conform to the minimum requirements of such statutes." (Emphasis added.) Accordingly, as of July 1, 2002, the Plan's anniversary date, the offset provision of the Plan was automatically amended to conform to the amended statute.
¶ 37 The question before us, then, is which version of the Plan defines Evans's benefits: the version of the Plan in effect before July 1, 2002; the version of the Plan in effect after July 1, 2002; or both, with the former defining his pre-July 1, 2002 benefits and the latter defining his post-July 1, 2002 benefits. The Plan itself answers this question. It states, "Amendments will not apply to claims arising prior to the amendment's effective date." Evans's claim arose at the earliest when he suffered the injury or disability forming the basis for his request for benefits, and at the latest when he applied for disability benefits. Evans applied for disability benefits in October 2001. Thus, both events occurred before July 1, 2002. Accordingly, the 2001 version of the Plan controls.
¶ 38 Under that version of the Plan, Educators was entitled to an offset for benefits received by Evans in connection with his military service. Accordingly, we affirm the ruling of the trial court that the 2001 version of the Plan controls, that benefits paid to Evans in connection with his military service may be offset against disability benefits paid pursuant to the Plan, and that to offset the benefits, Educators need not demonstrate that the disabilities for which Evans receives military benefits are the same disabilities for which he receives disability benefits under the Plan.

II. Evans's Medical Evidence of Disability from "Any and All Occupations"
¶ 39 Next, we turn to Educators' denial of disability benefits after the initial twenty-four months of payments. Under the Plan, whether an employee may receive benefits beyond twenty-four months depends on the extent of the employee's disability:
If a covered employee is disabled from performing the duties of the occupation he performed before disability, benefits will be paid while the covered employee is totally disabled up to 24 months. . . .
. . . [I]f a covered employee is disabled from performing any and all occupations, benefits will be paid while the covered employee is totally and permanently disabled. . . .
¶ 40 Educators initially determined that Evans was disabled only from performing the duties of his own occupation. Therefore, Educators awarded disability payments for only twenty-four months, ending January 11, 2004. However, Educators left open the door to extending benefits beyond the initial twenty-four months upon a showing of total disability. On January 7, 2004, while this litigation was pending, Evans requested that his benefits be extended. He explained that he was "in such a physical condition 'resulting from illness or injury' that permanently makes him `incapable of engaging in any occupation or employment for wage or profit.'" He also offered that "[i]f [Educators] require[d] further documentation or materials in connection with this request, or questions with which [Evans's counsel] may assist," to "kindly contact [counsel, who] would *609 be pleased to provide whatever additional information [Educators] may reasonably require."
¶ 41 On January 14, 2004, Educators responded. Educators stated that the review would take approximately thirty days, and stated that "[d]uring this time Mr. Evans will need to request all new current medical information from all doctors that are treating him for his disability at this time and who can substantiate that he is totally disabled from any and all occupations." In fact, Educators enumerated the documentation it required:
1. A detailed statement describing his diagnosis. Included should be the prognosis for his condition, how his disability prevents him from performing the duties of any occupations, either part-time or full-time.
2. During the past 24-months Mr. Evans should have undergone vocational rehabilitation as outline[d] in his approval letter. Vocational rehabilitation was supposed to have been done during the initial 24 months of benefits. Please include any reports to show what rehabilitation he has done.
3. We require current copies of diagnostic records, medical office notes, surgical and hospital reports, and any other medical or psychiatric records pertinent to Mr. Evans['s] disabling condition at the time of disability. It is Mr. Evans['s] responsibility to get this information to us; it is also his responsibility to pay for any report charges regarding disability.

4. He should have been under the care of an orthopedic surgeon, so please send in his records.
¶ 42 Evans did not submit all the requested documentation. Instead, he submitted a one-page report from Dr. Stephen D. Wood. The report included a chart that delineated various physical restrictions as either "continuous" or "intermittent." It also indicated that Evans could not work at his regular work, nor could he work eight hours a day. Two weeks after thatbut still within the thirty days specified by EducatorsEvans submitted a one-page letter from himself. This letter again addressed his previous counsel's failure to appeal within the time limit. It also stated, "I remain totally disabled and remain eligible for [benefits]." Evans does not claim to have submitted diagnostic records, medical office notes, surgical and hospital reports, or other medical or psychiatric records at this time. Educators did not point out the deficiencies in or otherwise respond to the records Evans did submit.
¶ 43 In August 2005a year and a half laterEducators moved for summary judgment. One of its claims was that Evans was not entitled to the extension of benefits beyond the initial twenty-four-month period. Educators reasoned that "Mr. Evans cannot bring a claim under the Plan for Permanent Benefits because he failed to provide Educators with any information regarding his medical condition at the time he made the claim." Evans responded that Educators "was already in possession of most of Evans'[s] medical records." Evans moved for partial summary judgment, asking the trial court to determine that he was totally disabled and unable to work in any and all occupations. At a hearing on February 16, 2006, the trial court orally denied the relevant portion of Educators' motion for summary judgment on the ground that Educators had not yet notified Evans of its decision on this issue.
¶ 44 Educators promptly denied Evans's appeal on the ground that he had failed to submit the required documentation:
1. [He] failed to provide Educators with any information relevant to [his] disability when it was requested in January 2004.
2. [He] failed to provide to Educators any proof that [he] continued to be disabled, as requested in December 2003 and January 2004.
3. [He] failed to provide Educators with any evidence that [he] w[as] participating in a vocational rehabilitation program while receiving disability benefits.
That letter gave Evans sixty days to appeal the decision to the Claims Review Committee.
¶ 45 Apparently unaware of this letter, the trial court entered an order on April 6, 2006, *610 again denying Educators' motion for summary judgment on this issue. The order repeated that Educators had not yet informed Evans of its decision. The court also denied the relevant portion of Evans's motion for summary judgment on the ground that Evans's counsel had conceded that "there were issues of material fact regarding these claims."
¶ 46 Within the sixty days designated for his contractually authorized appeal, Evans submitted additional medical information to Educators. The information included a lengthy letter from Evans's counsel describing Evans's medical problems and asserting that Educators had failed to provide Evans with the information he needed to successfully request benefits.[6] Educators subsequently informed Evans that his request for permanent disability benefits had been denied "for lacking medical evidence to support the disability," and informed him of his right to submit the matter to binding arbitration.
¶ 47 Educators renewed its motion for summary judgment, this time asserting that the appeals process was now complete on this issue. The trial court granted this motion, agreeing with Educators that "Evans did not provide supporting documentation in a timely manner in connection with his appeal as required by [the Plan]."
¶ 48 On appeal, Evans contends that the trial court erred in failing to require Educators to consider the medical evidence Evans presented in 2006 concerning his disability from any and all occupations. He asserts that "Educators' justifications for its denial were weak at best" because "[i]t already had evidence that Evans was disabled from any occupation." Evans also contends that Educatorsand the trial courtfailed to give him a full and fair review because, rather than allow Evans to prove his claim on the merits, Educators moved for summary judgment. He asks us to "remand the case for consideration of [his] claims of disability beyond the initial 24 month period on their merits."
¶ 49 In essence, Evans claims that Educators' requirement that he submit his full medical history within a certain period is unreasonable, and that to deny his claim on the basis of his failure to comply with that requirement is also unreasonable and unfair. He does not, however, provide any legal basis for this assertion. He does not, for example, assert that Educators' requirement violated section 49-21-401 of the Act, which states that "[a]n eligible employee shall apply for long-term disability benefits under this chapter by . . . providing any documentation or information reasonably requested by the office." Utah Code Ann. § 49-21-401(1)(c) (2002). The only law that Evans cites is a statement that a full and fair review requires "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." See Sage v. Automation, Inc. Pension Plan & Trust, 845 F.2d 885, 893-94 (10th Cir.1988). That case is inapposite, however, because it addressed a statutory entitlement to a "full and fair review" of a claim based on federal statutory law. See id. at 893; see also 29 U.S.C. § 1133 (2006).
¶ 50 In any event, Evans's complaint is not that he was denied an opportunity to address the accuracy and reliability of the evidence Educators relied on. Rather, he contends that Educators should have extended his benefits notwithstanding his failure to provide the medical records Educators required. Evans did not tell Educators and does not assert on appeal that the requested records were irrelevant, unnecessary, or non-existent, or that their production was unduly burdensome. Instead, he argues that "[i]t is not as if Evans submitted no medical evidence," and points to the scant medical evidence he did submit.
¶ 51 Evans has not shown or even alleged that Educators' demands were contrary to statute, case law, or the provisions of the Plan. Nor has he demonstrated that they were unreasonable or unfair under the circumstances. On the contrary, they appear reasonably calculated to satisfy Educators that Evans was, as he claimed, "totally disabled." *611 We therefore affirm the trial court's ruling on this issue.

III. Educators' Enforcement of Its Thirty-Day Appeal Deadline
¶ 52 Evans also challenges Educators' enforcement of its thirty-day window in which to request a contractual appeal. Educators initially awarded Evans only two-thirds of his full disability benefit on the ground that his injuries were not sustained on the job. He was given thirty days to write to Educators if he disagreed with any of the decisions made on his claim. He timely wrote to Educators. When his claim was again denied, he was given sixty days to appeal to Educators' Claims Review Committee. He timely appealed. When his claim was denied at that level, he was given thirty days to appeal to Educators' Board of Directors. He filed his appeal on the fifty-eighth day. Based on the untimeliness of this appeal, Educators declined to review Evans's claim that his disabling conditions were a result of injuries sustained on the job. This denial had the effect of confirming that Evans would receive benefits in the amount of only two-thirds of his salary. The trial court agreed with Educators that Evans's untimely appeal barred his recovery under the Plan on this claim:
Mr. Evans failed to comply with the contractual requirements of the disability benefits policy. . . . Mr. Evans cannot attempt to recover under the Plan when he failed to comply with the Plan by failing to appeal within the 30 days required by the Plan. Therefore, his failure to abide by the Plan's dispute resolution process bars him from recovery under the Plan [on] this claim.
¶ 53 On appeal, Evans asserts that his missing the thirty-day deadline should not bar his claim. He advances three main arguments: (1) the thirty-day deadline "is not substantially similar to [the Act]" because the Act does not contain any type of thirty-day appeal limitation; (2) "Educators has used [the deadlines] as tripwires for the unwary claimant or their attorney"; and (3) strictly enforcing the deadline is unreasonable because not strictly enforcing the dead-line would cause Educators no prejudice. We address each in turn.
¶ 54 First, Evans contends that Educators' thirty-day deadline "is not substantially similar to [the Act] on the point of deadlines for submitting administrative appeals." See Utah Code Ann. § 49-9-102 (1998), id. § 49-21-201(6) (2002). Evans points out that the Act contains only one deadline, and even it contains a reasonableness exception:
A claim brought by an eligible employee for long-term disability benefits . . . is barred if it is not commenced within one year from the eligible employee's date of disability, unless the office determines that under the surrounding facts and circumstances, the eligible employee's failure to comply with the time limitations was reasonable.
Id. § 49-21-401(9) (2002); cf. id. § 49-9-401(4) (1998). Evans asserts that Educators' imposition of a series of deadlines renders the Plan not "substantially similar" to the Act.
¶ 55 Educators agrees that the Plan must be substantially similar to the Act, but asserts that it is. Educators argues that while the Plan's appeal deadlines are not "identical" to the Act, the Plan is nevertheless substantially similar. Educators further asserts that an absence of any deadlines, save a one-year deadline for filing claims, would render administration of the Plan unwieldy. Educators also asserts that, under Evans's interpretation, "municipality plans could have no deadline at all, meaning Mr. Evans could have appealed the Claims Review Committee's decision, e.g., 30 years later."
¶ 56 We do not read the requirement that a long-term disability plan be "substantially similar" to the Act to apply to appeal deadlines. To begin with, the Act mentions neither appeal deadlines nor appeals. In fact, it contains only two sentences addressing procedure. See id. § 49-21-401(1), (9) (2002). One sentence requires a claimant to complete an application form prepared by the office, sign a consent form allowing the office access to the claimant's medical records, and provide any documentation or information reasonably requested by the office. See id. *612 § 49-21-401(1). The other creates a one-year filing deadline with an exception if the plan administrator determines that the employee's non-compliance was reasonable. See id. § 49-21-401(9). Given the fact that the Act is almost entirely silent concerning procedure, we cannot conclude that the Legislature intended the substantial similarity requirement to encompass claims procedures. Few, if any, long-term disability plans would qualify as substantially similar under such a narrow reading. We agree with Educators that the substantial similarity clause does not invalidate the Plan's appeals deadlines here.
¶ 57 Second, Evans contends that the deadlines are being used as "tripwires" and are therefore per se unreasonable. We disagree. The appeals deadlines are clearly stated in the Plan itself. Evans had notice of them, and, in fact, had already complied with a thirty-day deadline and a sixty-day deadline. Moreover, Evans cites to no legal authority stating that such deadlines are unenforceable as a matter of contract law.
¶ 58 Third, Evans asserts that the Plan's thirty-day deadline is unenforceable because his untimely filing "did not result in any prejudice to Educators, Salt Lake City, or the Plan." Evans relies on Utah Code Ann. § 31A-21-312(2) (2010). That section provides that an insured's failure to give timely notice or proof of loss "does not bar recovery under the policy if the insurer fails to show it was prejudiced by the failure." Id. Initially, we note that even Evans does not claim that this section controls this issue; rather, he argues that it "provides a suitable analogy." In effect, he asks this court to fashion an equitable exception to the Plan's strict appeal deadlines. On one hand, we share Evans's concern with the Plan's multiple layers of administrative appeals, each with a firm filing deadline that must be met at the peril of forfeiting judicial merits review.[7] On the other hand, while the Legislature has expressly required safety valves in some circumstances as noted above, it has not yet required them in this context.
¶ 59 Moreover, nothing here prevented Evans from complying with the deadline. Evans points to no record evidence suggesting that his failure to timely appeal was reasonable under the circumstances, see, e.g., id. § 49-21-401(9) (2002), or demonstrating excusable neglect or good cause, see, e.g., Utah R.App. P. 4(e). In fact, he forthrightly characterizes his position with Educators as having "asked for mercy." Evans observes that many claimants in his circumstances will be unrepresented. But Evans himself does not fall into that category. We express no opinion as to whether a plan administrator could strictly enforce an appeal deadline of this type against a claimant capable of demonstrating good cause or excusable neglect. But Evans is not such a claimant.
¶ 60 In sum, Evans has not demonstrated that the deadlines in the Plan, or their enforcement in this instance, violated any precedent, statute, rule, regulation, or contract provision. Further, Evans has never argued that he could not comply with the final deadline, only that he did not comply with it, but hoped Educators would excuse his untimeliness. We therefore affirm the trial court's ruling on this issue.

IV. Applicability of the Plan's Arbitration Clause
¶ 61 Finally, we turn to the question of arbitration. Before addressing the legal arguments presented, we review the relevant arbitration-related facts. We begin with the arbitration clause itself. The Plan states that, after following the appeals process, "[i]f the covered employee is not satisfied with the decision of the Board of Directors, and wishes to continue with arbitration, he may make a written request for arbitration of the disputed claim within 15 days of receiving the decision." The Plan prominently states, "Any matter in dispute between the insured and Educators is subject to arbitration pursuant to the rules of the American Arbitration Association. . . . All parties are bound by *613 the decision of the arbitration committee, which is final."
¶ 62 This lawsuit began when Educators sued Evans to recover what it claimed were overpayments. Evans defended, counter-claimed against Educators, and brought third-party claims against the City. More than a year into litigation, the City moved for summary judgment in part on the ground that Evans's third-party claims were barred by the arbitration clause. Evans responded that the arbitration clause was unenforceable. On November 27, 2006, the trial court granted the City's motion for summary judgment and dismissed Evans's third-party complaint against the City with prejudice. The trial court determined that "the arbitration provisions of the [Plan] were consistent with and enforceable under the relevant Utah law and administrative rules."
¶ 63 On appeal, Evans contends that "[t]he trial court's ruling that Salt Lake City is entitled to enforce the Plan's arbitration provision must be reversed." He asserts that Educators acted as the City's agent and that, by pursuing litigation, Educators waived not only its own right to arbitrate, but also the City's. Educators argues that issues concerning arbitration are moot because no party is moving to compel arbitration and because the trial court has already adjudicated the same claims vis-a-vis Educators, with whom the City is in privity.
¶ 64 The City advances several arguments. First, the City contends that Evans waived his challenge to the arbitration clause by not pleading it in his third-party complaint against the City. Accordingly, the City reasons, once the City raised the arbitration clause in its motion for summary judgment, Evans had already waived his argument that the arbitration clause was unenforceable. The City quotes Holmes Development, LLC v. Cook, 2002 UT 38, 48 P.3d 895, for the proposition that "[a] plaintiff cannot amend the complaint by raising novel claims or theories for recovery in a memorandum in opposition to a motion to dismiss or for summary judgment because such amendment fails to satisfy Utah's pleading requirements." Id. ¶ 31 (citations omitted). In Holmes, the plaintiff brought three causes of action in his complaint: "(1) negligence, (2) breach of warranty, and (3) indemnification of damages under the indemnity agreement resulting from [the defendants'] alleged negligence." Id. ¶ 14. The defendants moved for summary judgment, and in his memorandum in opposition, the plaintiff raised the new claim of breach of contract. See id. ¶¶ 30-31. The supreme court refused to allow the plaintiff to effectively amend his complaint in this way. See id. ¶ 59. Holmes does not apply here. Evans's arbitration argument was a response to the City's defense, not a new claim for recovery or a back-door attempt to amend his complaint. Accordingly, it was not waived under Holmes.
¶ 65 Moreover, Evans is correct that Educators waived its right to compel arbitration in lieu of litigation. "Arbitration is a matter of contract." Buckner v. Kennard, 2004 UT 78, ¶ 18, 99 P.3d 842 (internal quotation marks omitted). Such contracts "are to be enforced according to their terms." Id. A party who has agreed to an arbitration clause waives its right to arbitrate if the opposing party can "demonstrate (1) that the party seeking arbitration substantially participated in the underlying litigation to a point inconsistent with the intent to arbitrate; and (2) that this participation resulted in prejudice to the opposing party." Cedar Surgery Ctr., LLC v. Bonelli, 2004 UT 58, ¶ 14, 96 P.3d 911; see also ASC Utah, Inc. v. Wolf Mt. Resorts, LC, 2010 UT 65, ¶ 29, 245 P.3d 184.
¶ 66 The first prong of this test "requires the court to consider `the actions of the party seeking arbitration, and whether those actions evidence an intent to submit to the jurisdiction of the court and pursue redress through litigation.'" ASC Utah, Inc., 2010 UT 65, ¶ 30, 245 P.3d 184 (quoting Central Fla. Invs., Inc. v. Parkwest Assocs., 2002 UT 3, ¶ 26, 40 P.3d 599). By filing the complaint, Educators plainly evidenced an intent to submit to the jurisdiction of the court and pursue redress through litigation. The first prong is thus satisfied.
¶ 67 Educators' participation in litigation also meets the second prong of this testit resulted in prejudice to the opposing *614 party. "Prejudice includes the other party incurring the types of expenses that arbitration is designed to alleviate." Id. ¶ 35 (internal quotation marks omitted). Here, Educators' lawsuit required Evans to fully engage in the litigation process, incurring "the types of expenses that arbitration is designed to alleviate or expenses that [he] would not have incurred if [Educators] had restricted its efforts to arbitration," see id. (internal quotation marks omitted). Finally, any attempt to compel arbitration this far into the litigation process might indicate "a desire to forum-shop after the judicial waters [have] . . . been tested," see id. ¶ 36 (alteration and omission in original) (internal quotation marks omitted). Thus, we conclude that Educators waived the right to arbitrate.
¶ 68 We also agree with Evans that Educators, as the City's agent, waived the City's right to arbitrate. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an `agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency, § 1.01 (2006); see also Zions First Nat'l Bank v. Clark Clinic Corp., 762 P.2d 1090, 1094-95 (Utah 1988) (explaining actual and apparent authority in Utah agency law). Further, "`[a] contract of the agent is [a] contract of the principal.'" Garland v. Fleischmann, 831 P.2d 107, 110 (Utah 1992) (quoting Ford v. Williams, 62 U.S. 287, 289, 21 How. 287, 16 L.Ed. 36 (1858)). Neither party has disputed that Educators was the agent of the City. The terms of the Plan support the conclusion that it was. The Plan begins by stating that "Salt Lake City Corporation (hereinafter `the City') will provide benefits as described on the face page of this Plan." Further, the 2002 version of the Plan states that "[t]he covered employee may initiate arbitration proceedings by giving written notice to Educators, on behalf of the City, of the election to proceed with binding arbitration." The Plan also states that "[t]he arbitration shall be conducted by a single arbitrator selected by mutual agreement of the covered employee and Educators, on behalf of the City." Accordingly, the Plan's arbitration clause was binding on the City as well as on Educators. Thus, Educators' waiver of the right to compel arbitration in lieu of litigation also waived that right for the City.
¶ 69 The City's remaining arguments either fall under this line of reasoning or are unsupported by citation to legal authority. See Utah R.App. P. 24(a)(9); Benjamin v. Utah State Tax Comm'n, 2011 UT 14, ¶ 29 n. 8, 250 P.3d 39 (explaining inadequate briefing). We do not address them further. See State v. Carter, 776 P.2d 886, 889 (Utah 1989). Accordingly, the trial court's grant of summary judgment to the City and dismissal of Evans's third-party complaint against the City is reversed and the matter remanded for further proceedings.[8]

CONCLUSION
¶ 70 We affirm the trial court's conclusion that Educators correctly offset Evans's disability benefits by his VA benefits. Second, the trial court did not err when it did not require Educators to consider Evans's medical evidence concerning whether he was disabled from "any and all occupations," because Evans did not comply with Educators' reasonable request for medical information. Third, we affirm the trial court's conclusion that Educators was entitled to insist upon compliance with its thirty-day deadline to appeal the question of whether Evans's disability was sustained on the job. Finally, we conclude that the trial court erred in enforcing the arbitration provision against Evans in his lawsuit against the City. We conclude that the City waived the arbitration provision by allowing Educators, as its agent, to pursue litigation.
¶ 71 Accordingly, we affirm the rulings of the trial court insofar as they relate to Educators. We reverse the ruling of the trial court as it relates to the City and remand for *615 such proceedings as may be appropriate on that claim.
¶ 72 WE CONCUR: GREGORY K. ORME and STEPHEN L. ROTH, Judges.
NOTES
[1] This amount was lower than the amount Educators originally asserted that Evans owed because Educators began applying Evans's benefits to his overpayment debt in January 2003.
[2] The trial court was apparently unaware that Educators had recently denied Evans's renewed request for an extension of benefits.
[3] In 2001, when Evans applied for disability benefits, the Act was found at Utah Code Ann. §§ 49-9-101 through -409 (1998). In 2002, the Act was amended and renumbered as Utah Code Ann. §§ 49-21-101 through -407 (2002). The current version retains that numbering system, see Utah Code Ann. §§ 49-21-101 to -406 (2010). The 2001 and 2002 versions are both relevant to this case and we refer to them by year. The current version is not at issue.
[4] This litigation began with Educators seeking a ruling that it was entitled to offset Evans's VA benefits against his Plan benefits and a judgment against Evans for overpayments Educators made before learning that Evans was receiving VA benefits. Evans responded that he was entitled to receive the alleged overpayments; he also counterclaimed, seeking amounts withheld by Educators after learning that Evans was receiving VA benefits. Thus, Educators' and Evans's positions were mirror images of one another, Educators claiming it was entitled to offset VA benefits, Evans claiming it was not. Despite Educators' argument that Evans's claim was barred by his failure to exhaust the contractual appeals process, the trial court ruled on the merits of this issue. That ruling is now before us. Educators argues the merits of the claim but in effect asks us to affirm on the alternative ground that Evans is procedurally barred by failing to properly exhaust his administrative appeals. We decline to do so. See Bailey v. Bayles, 2002 UT 58, ¶ 13, 52 P.3d 1158 (holding that an appellate court may affirm on any legal ground apparent on the record). Like the trial court, we address the offset issue on the merits.
[5] The Plan actually reads "Sections 49-9-40 and 49-9-402." However, section 49-9-40 does not exist. Based upon the context, we conclude that this was a typographical error and the Plan intended to refer to section 49-9-401.
[6] That letter alludes tobut does not providethe medical records that Educators requested.
[7] The trial court's analysis assumes that Evans's failure to properly exhaust Educators' appeals process bars judicial review on the merits. Evans does not challenge this assumption. We therefore do not examine it. See Peterson v. Jackson, 2011 UT App 113, ¶ 22, 253 P.3d 1096 ("Defining the issues on appeal is the right and burden of the appellant.").
[8] We recognize that, in view of our resolution of the other issues on appeal, further proceedings may not be necessary.